UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

EGYPTIAN NAVIGATION CO.

                Plaintiff,

         - against -

BAKER INVESTMENTS CORPORATION and
BAKER INTERNATIONAL GROUP

                Defendants.

----------------------------------------------------------------X

**ECF CASE**

08 Civ. 02080 (SHS)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR STAY OF
<u>EXECUTION OF ORDER VACATING MARITIME ATTACHMENT</u>**

**Law Offices of Rahul Wanchoo**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (646) 593-8866

Of Counsel:

Rahul Wanchoo, Esq.

## PRELIMINARY STATEMENT

Plaintiff, Egyptian Navigation Co. ("Plaintiff"), by its undersigned counsel, submits the within Memorandum of Law in Support of its Motion pursuant to Federal Rule of Civil Procedure 62(c) for a stay pending appeal of the Opinion and Order ("*Order*") (annexed hereto as Exhibit 1) entered April 14, 2008 vacating the maritime attachment of certain funds restrained by Citibank.

## BACKGROUND

In its April 14, 2008 *Order*, the Court held that the Baker Investments Corporation ("Baker") had no interest in the Electronic Funds Transfer ("EFT") because it had previously assigned to Adora Investments Inc. ("Adora") all rights to the payment. *Order* at 1. The Court found that the March 5, 2008 letter from Baker to Louis Dreyfus gave "sufficient notice" that Baker's interest in the freight payment had been transferred to Adora and accordingly the assignment appears to be effective under English law. *Order* at 10. The Court further found that even if the March 5, 2008 was insufficient notice to create a statutory assignment under English law, Adora, as an equitable assignee of the freight payment, owned the EFT restrained by CitiBank. *Order* at 11. Finally, the Court concluded that inclusion by Louis Dreyfus of Baker's name in the EFT instructions was anything other than a "simple clerical mistake." *Order* at 11-12.

For the reasons set forth herein, Plaintiff respectfully moves the Court for an order staying execution of the April 14, 2008 *Order* vacating the maritime attachment of funds in the hands of garnishee Citibank in the total amount of $127,755.79 pending the outcome of Plaintiff's appeal to the Second Circuit.

**ARGUMENT**

**A STAY OF EXECUTION OF THE APRIL 14, 2008 ORDER
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 62(c) IS APPROPRIATE**

Plaintiff seeks a stay of the April 14, 2008 *Order* pursuant to Federal Rule of Civil

Procedure 62(c). Rule 62(c) states:

> When an appeal is taken from an interlocutory or final judgment granting,
> dissolving, or denying an injunction, the court in its discretion may suspend,
> modify, restore, or grant an injunction during the pendency of the appeal upon
> such terms as to bond or otherwise as it considers proper for the security of the
> rights of the adverse party.
>
> Fed. R. Civ. P. 62(c)
>
> The factors relating to a discretionary stay under *Rule 62(c)* include:
> (1) Whether the movant has demonstrated "a substantial possibility, although less
> than a likelihood, of success" on appeal;
> (2) The risk of irreparable injury to the movant absent a stay;
> (3) The lack of substantial harm to the non-movant if the stay is granted;
> (4) The public interests that may be affected.
>
> *Centauri Shipping Ltd v. Western Bulk Carriers KS et al*, 528 F. Supp.2d 186,
> 189-90 (S.D.N.Y.2007) citing to *Hirschfeld v. Bd. of Elections, 984 F.2d 35, 39
> (2d Cir. 1993) Tower Automotive, 2007 U.S. Dist. LEXIS 49282, 2007 WL
> 1975447, at * 1-2.* In making such a determination, "[t]he Court treats these
> factors 'somewhat like a sliding scale.'" *United States v. VISA U.S.A., Inc., No. 98-
> CV-7076 (BSJ), 2007 U.S. Dist. LEXIS 58018, 2007 WL 2274866, at *1 (S.D.N.Y.
> Aug. 7, 2007)* (quoting *Thapa v. Gonzales, 460 F.3d 323, 334 (2d Cir. 2006)).*
> Thus, "'the necessary level or degree of possibility of success will vary according
> to the court's assessment of the other stay factors.'" *Id. See also Hayes v. City
> Univ. of New York, 503 F. Supp. 946, 962 (S.D.N.Y. 1980)* ("Issuance of a stay
> pending appeal is discretionary and equitable . . .")

(1) <u>Substantial Possibility of Success On Appeal</u>

In applying the foregoing factors, it is noteworthy that "substantial possibility of success

in the appeal" is not a rigid concept. *See Washington Metro. Area Transit Comm'n v. Holiday

Tours,* 182 U.S. App. D.C.220, 559 F.2d 841, 844 (D.C.Cir.1977) ("an order maintaining the

status quo is appropriate when a serious legal question is presented, when little if any harm will

befall other interested persons or the public and when denial of the order would inflict

irreparable injury on the movant. There is substantial equity, and need for judicial protection,

whether or not movant has shown a mathematical probability of success").

Plaintiff respectfully disagrees with the Court's analysis and conclusion that the March 5,

2008 letter gave Louis Dreyfus "sufficient notice" that Baker's interest in the freight payment

had been transferrerd to Adora, or that Adora owned the EFT restrained by Citibank as an

equitable assignee of the freight payment. In support, Plaintiff has submitted the declaration of

an English barrister, Mr. Mark Wingate Jones, which is annexed hereto as Exhibit 2 ("*Jones*

*Decl.*"). In fact, as opined by Mr. Jones, "whether the purported assignment qualified as a

'statutory assignment' under s. 136 of the [English] Law of Property Act is irrelevant, as is the

issue of notice to the debtor". (*Jones Decl.* ¶ 7 b.) (emphasis added). He goes on to say:

> The important distinction in this case is that between an actual 'equitable assignment' on the one hand, and an 'agreement to assign' on the other.

> It is not possible to transfer something which does not exist, and so the subject matter of an actual 'equitable assignment' cannot be a mere expectancy.

> A purported assignment of an expectancy might take effect so as to trigger the rule in 'Holt' if it can be, and is, construed as an 'agreement to assign' that expectancy.

> Equity will elevate an 'an agreement to assign' an expectancy beyond a mere matter of contract so as to bring the rule into 'Holt' into play if that contract is specifically enforceable and supported by valuable consideration.

> In the absence of valuable consideration, equity will not intervene, and thus – in this case - there would have been no prior transfer of the right to the sub-freights so as to defeat the Rule B attachment.

> *Id.* ¶ 7 c.-g.

Mr. Jones concludes: "I think that the arguments available to [Plaintiff] give rise to a substantial

possibility of it succeeding on the appeal." (*Jones Decl.* ¶ 41). Thus, this is a case that ought to

be considered by the Second Circuit, and a stay of the Court's April 14, 2008 *Order* is appropriate in order to maintain the status quo during the appeal process.

Most importantly, a stay is necessary to ensure that Plaintiff will retain security for its claims pending the London arbitration if the Second Circuit reverses the April 14, 2008 *Order* vacating the attachment. Although continuous control of the *res* is no longer a prerequisite to maintaining jurisdiction in an *in rem* action[1], release of attachment in an action under Rule B produces the undesirable consequence of leaving the Plaintiff with no security to enforce an eventual judgment in its favor. This result is counterproductive to one of Rule B's two primary goals, i.e. to assure satisfaction if a suit is successful. *See Winter Storm Shipping Ltd. V. TPI*, 310 F.3d 263 (2d Cir. 2002); *Aurora Maritime co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 48 (2d Cir. 1996).

(2) Irreparable Injury to Plaintiff

With regard to the issue of "irreparable injury" to Plaintiff, if the funds restrained by Citibank are released before the case is considered on appeal, there would be no method by which the Court could assure its return should Plaintiff succeed on appeal. The release of the *res* in this situation would effectively result in the prototypical "useless judgment", because by the time the Second Circuit renders its decision, Defendant Baker, with no known assets and a questionable credit history[2] would, presumably, be long gone. As stated by Mr. Mohamed Shaaban in his declaration (*Shaaban Decl.*) (Annexed hereto as Exhibit 3):

> BIC has no available assets to secure the ENC claims or to satisfy any favorable
> arbitration award. As BIC is an offshore company, I doubt that that ENC will now locate

---

[1] *Republic Nat'l Bank of Miami v. United States*, 506 U.S.80 121 L.Ed. 2d 474, 113 S.CT. 554(1993). *See also Stevedoring Servs. Of America v. Ancora Transp., N.V.*, 59 F.3d 879 (**9th Cir. 1995**) (district court's release of the funds did not divest the court of jurisdiction over the res).

[2] As stated by Mr. Phillipos Gallanis in his affirmation in support of Adora's motion to vacate attachment, Baker borrowed money from Adora in 2005 and 2006 and subsequently defaulted on the repayment of the loan which resulted in the purported assignment of the sub freights of the DJEBEL REFAA to Adora.

any BIC assets. If the ENC motion for a stay of the execution of the order vacating the maritime attachment is denied, serious prejudice would be caused to ENC's claims in the London arbitration.

*Shaaban Decl.* ¶ 4.

As the court stated in *Status Int's S.A. v. M/V Esperanza C,* 1998 U.S. Dist. LEXIS 2825

(SAS) (S.D.N.Y. 1998):

> The Court in *Swift & Co. Packers,* 339 U.S. at 689, constituted the language of § 1291 as permitting an immediate appeal from an order vacating a maritime attachment because "appellate review of the order. . . at a later date would be an empty rite after the vessel had been released and the restoration of the attachment only theoretically possible."

*Id.* at *10. Absent a stay, Plaintiff will be irreparably injured by the loss of security represented

by the maritime attachment of funds in the hands of garnishee Citibank.

 (3) <u>Lack of Substantial Harm to Non-Party Adora</u>

 Beyond the cost of this action and cost on appeal, it is difficult to envision any substantial

harm to Adora by virtue of a stay of the order vacating the attachment of the funds restrained at

Citibank.  This is particularly true because under the Deed of Assignment in addition to the

assignment of the sub freights from the sub-charter of the DJEBEL REFFA to Louis Dreyfus,

which has been restrained by Citibank, Baker has also assigned "all other sub-freights from

**subsequent fixtures** of the vessels DJEBEL REFFA until the Debts has been repaid in full".

(*Gallanis Affirmation, Ex. A*) (*emphasis added*). Accordingly, if Baker is trading the vessel

DJEBEL REFFA which presumably it is, Adora will receive all future freight payments from the

vessel "until the Debt has been repaid in full."  Furthermore, once Adora's debt has been repaid

in full, Adora's alleged interest in the $127,755.79 restrained at Citibank would revert back to

Baker.

6

Under these circumstances, the court has the discretion to eliminate the supersedeas bond requirement altogether, to order a reduced bond and/or to order an alternate form of security. The court "may order partially secured or unsecured stays if they do not unduly endanger the judgement creditor's interest in ultimate recovery." *Texaco Inc. v. Penzoil Co.,* 784 F.2d 1133. 1154 (2d Cir. 1986) *rev'd on other grounds,* 481 U.S.1, 95 L. Ed.2d 1, 107 S. Ct. 1519 (1987) (citing *Trans WorldAirlines, Inc. v. Hughes, 314* F. Supp. 94 (S.D.N.Y. 1970), *aff'd in relevant part,* 515 F.2d 173 (2d Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1147, 47 L. Ed. 2d 341 (1976)).

Accordingly, if Adora prevails on appeal, the attachment will be vacated and the funds at Citibank will be released and the only damages Adora will have arguably suffered will be the costs of this action and costs on appeal. Conversely, if the Court refuses to stay enforcement of the order vacating the attachment and the Plaintiff subsequently prevails on appeal, the victory will accord Plaintiff a hollow rite because the money now held by Citibank will be long gone. Thus, under these circumstances, Plaintiff respectfully submits that the Court should exercise its discretion and waive the supersedeas bond requirement. In the alternative, because the Order in Adora's favor is not a money judgement, the Plaintiff should be required to post supersedeas bond in an amount not exceeding $2,500.

Finally, a stay will serve the public interest by maintaining the status quo during appeal of this case of appellate first impression and ensuring that ultimate liability judgments issued by this Court are enforceable and not simply hollow, useless rights.

7

## Conclusion

Because the Plaintiff has made a strong showing of substantial possibility of success on appeal, irreparable injury in the absence of stay; and lack of substantial harm to Adora, a stay pursuant to Federal Rule of Civil Procedure 62 should be granted. Likewise, because this case does not involve a money judgment in Adora's favor, there is no real need for a supersedeas bond. Accordingly, Plaintiff requests that the Court waive the bond requirement.

Dated: New York, New York
      May 5, 2008

                       Respectfully submitted,

                       **LAW OFFICES OF RAHUL WANCHOO**
                       Attorneys for Plaintiff
                       Egyptian Navigation Co.

                       By:   _Rahul Wanchoo_
                            Rahul Wanchoo (RW-8725)

8

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

EGYPTIAN NAVIGATION CO.,                    :        08-Civ-2080 (SHS)
                                            :
                        Plaintiff,          :
                                            :        OPINION AND
                                            :        ORDER
        -against-                           :
                                            :
BAKER INVESTMENTS CORPORATION and           :
BAKER INTERNATIONAL GROUP,                  :
                                            :
                        Defendants.         :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

        Non-party Adora Investments Inc. has moved to vacate a maritime attachment

that plaintiff Egyptian Navigation Co. had obtained against defendants Baker Investments

Corporation ("Baker") and Baker International Group to the extent that certain property

was attached. That property consisted of funds in a New York bank that were being

routed via Electronic Funds Transfer ("EFT") to a bank account in Greece. Because the

company initiating the EFT had named Baker as the beneficiary of the transaction, the

funds appeared to belong to Baker and therefore appeared to be subject to the attachment.

The funds were therefore restrained in New York. However, the designation of Baker as

the beneficiary was a clerical mistake, the EFT was in fact intended to benefit Adora, and

the EFT was actually routed to a bank account controlled by Adora and not by Baker.

Further, Baker had no interest in the funds because it had previously assigned to Adora

all rights to the payment. Under these circumstances, Egyptian has failed to carry its

burden of showing that the attachment was proper pursuant to Rule B of the

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Admiralty Rules"). Accordingly, Adora's motion is granted.

## I.    BACKGROUND

According to the complaint, on March 1, 2006, Baker, a Greek corporation, chartered the M/V Domiat (the "Vessel") from Egyptian under a time charter party. (Compl. ¶¶ 2, 5.) Soon thereafter, Baker attempted to order the Vessel to an icebound port in violation of the charter party and over Egyptian's protests. (Id. ¶ 7.) Baker also allegedly refused to pay certain up-front costs and other amounts due under the charter. (Id. ¶¶ 7-9.) On March 10, 2006, the charter was terminated, and Egyptian subsequently initiated arbitration proceedings in London. (Id. ¶¶ 8-9.) The complaint alleges that Baker International Group is both the holding parent and alter ego of Baker. (Id. ¶¶ 17, 19.)

Egyptian commenced this lawsuit on March 3, 2008 and sought an ex parte order for process of maritime attachment pursuant to Rule B of the Admiralty Rules. After determining that the conditions for a Rule B attachment existed as set forth in Egyptian's papers, this Court entered an order authorizing process of maritime attachment against property "belonging to, claimed by or being held for the Defendants . . . in an amount up to and including $279,230.98."

Egyptian then served the attachment on various garnishee banks and was rewarded on March 5, 2008 when Citibank notified Egyptian that it had intercepted and restrained an EFT in the amount of $127,755.79 "for the benefit of Baker Investments Corporation." (Email from Mary Mihalik to Rahul Wanchoo dated March 5, 2008, Ex. 3

2

to Decl. of Rahul Wanchoo dated March 21, 2008 ("Wanchoo Decl.").) Adora claims in

this motion that the restrained funds belonged to it rather than to Baker.

    The EFT at issue was initiated by Louis Dreyfus Commodities Suisse S.A., a non-

party to this action that had prior independent dealings with Baker. Specifically, Louis

Dreyfus sub-chartered a vessel from Baker in February 2008 and was required to make

freight payments to Baker under the sub-charter. (Affirmation of Antonis Lemos dated

March 14, 2008 ("Lemos Aff.") ¶ 3.) On March 5, 2008, Baker sent a freight invoice to

Louis Dreyfus requesting payment of $127,755.79 due under the sub-charter. (Lemos

Aff. ¶ 5.) In a cover letter accompanying the invoice, Baker stated,

> [w]e would appreciate if you could remit the [funds] to the following
> account:
>
> EFG EUROBANK ERGASIAS
> Acc. Name: ADORA INVESTMENTS INC.

(Letter from Baker to Louis Dreyfus Ref: M/V Djebel Refaa CP DD 20/02/2008 dated

March 5, 2008, Ex. B to Lemos Aff.)

    Baker requested that Louis Dreyfus remit payment to Adora rather than to itself

because Baker had previously assigned its rights under the Louis Dreyfus sub-charter to

Adora in satisfaction of a prior debt. (Lemos Aff. ¶ 4; Affirmation of Phillipos Gallanis

dated March 14, 2008 ("Gallanis Aff.") ¶ 5; Deed of Assignment dated February 22,

2008, Ex. A to Gallanis Aff.) Specifically, in 2005 and 2006, Adora had loaned Baker

$195,000 that was to be repaid with interest by January 31, 2008. (Gallanis Aff. ¶¶ 3-4.)

Baker did not pay any part of its debt by the January 31, 2008 deadline. (Id. ¶ 4; Lemos

Aff ¶ 4.) As a result, on February 22, 2008 Adora and Baker entered into a Deed of

Assignment that stated in relevant part:

3

> The Assignor [Baker] hereby assigns to the Assignee [Adora] with full
> title guarantee irrevocably and absolutely
>
> . . .
>
> the sub freights (Earnings) from the sub charter of the vessel Djebel
> Reffaa to Louis Dreyfus estimated to be in the sum of USD 120,000
>
> . . .
>
> [Baker] shall direct that the Earnings shall be paid to . . . Adora
> Investments Inc
>
> . . .
>
> This deed and any disputes or claims arising out of or in connection with
> its subject matter are governed by and construed in accordance with the
> law of England.

(Deed of Assignment dated February 22, 2008, Ex. A to Gallanis Aff.)

As noted above, consistent with the assignment, Baker's March 5, 2008 freight invoice requested that Louis Dreyfus pay the amount due directly to Adora. The record reveals, however, that Louis Dreyfus did not remit its freight payment in precisely the manner requested by Baker. As requested in Baker's letter, Louis Dreyfus instructed its own bank to transfer $127,755.79 to an account owned by Adora. (UBS KeyLink Cash Payment Confirmation dated March 5, 2008, Ex. B to Gallanis Aff; Gallanis Aff. ¶ 8; Lemos Aff. ¶ 6.) However, rather than identifying the recipient of its EFT as Adora, Louis Dreyfus named Baker's Branch Office in Piraeus, Greece, as beneficiary of the transfer. Adora characterizes this as a clerical mistake, (Gallanis Aff. ¶ 8; Lemos Aff. ¶ 6), and nothing in the record suggests otherwise. Indeed, Adora has presented evidence that within one day, Louis Dreyfus attempted to correct the EFT instructions by sending a message through its bank that the "beneficiary name should be ADORA

4

INVESTMENTS INC instead of BAKER INVESTMENT CORPORATION." (Lemos

Aff. ¶ 6; UBS KeyLink Outgoing Message Detail dated March 6, 2008, Ex. D to Lemos

Aff.) Adora has presented uncontested evidence that it is a wholly separate entity from

Baker and has "no connection whatsoever" with Baker aside from the transactions giving

rise to the prior existing debt and the subsequent assignment of Baker's rights under the

Louis Dreyfus sub-charter. (Glannis Aff. ¶ 10.) On March 27, 2008, the Court heard oral

argument on Adora's motion to vacate.

## II.    DISCUSSION

### A.    Standards on Motion to Vacate a Maritime Attachment

To obtain a maritime attachment, a plaintiff must comply with Rule B, which

states:

> (a) If a defendant is not found within the district . . . , a verified complaint
> may contain a prayer for process to attach the defendant's tangible or
> intangible personal property—up to the amount sued for—in the hands of
> garnishees named in the process.
>
> (b) . . . The court must review the complaint and affidavit [stating that the
> defendant cannot be found within the district] and, if the conditions of this
> Rule B appear to exist, enter an order so stating and authorizing process of
> attachment and garnishment.

Admiralty Rule B(1).

Admiralty Rule E(4)(f) affords any person claiming an interest in property that

has been attached pursuant to Rule B an opportunity to contest the attachment. Upon

such a request, the plaintiff bears the burden of showing that the attachment should not be

vacated. Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin Co., No. 06-cv-

13765, 2007 WL 1002265, at *3 (S.D.N.Y. Apr. 4, 2007). To avoid vacatur, the plaintiff

must show that: "1) it has a valid prima facie admiralty claim against the defendant;

5

2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006).

The sole issue upon this motion to vacate the attachment is whether plaintiff has carried its burden of demonstrating that the funds restrained by Citibank are the "defendant's . . . personal property," rather than the property of non-party Adora. Rule B(1)(a). If the funds are indeed Adora's property and not Baker's, then the Court must vacate the attachment. T&O Shipping, Ltd. v. Source Link Co., Ltd., No. 06-cv-7724, 2006 WL 3513638, at *13-14 (S.D.N.Y. Dec. 6, 2006); DS Bulk Pte. Ltd. v. Calder Seacarrier Corp., No. 05-cv-10146, 2006 WL 1643110 (S.D.N.Y. June 13, 2006).

The EFT restrained by Citibank consisted of payment for freight charges remitted by Louis Dreyfus pursuant to a sub-charter. As a general matter, the types of property interests subject to attachment are defined broadly and include debts owed to a defendant. See, e.g., Winter Storm Shipping , Ltd. v. TPI, 310 F.3d 263, 276 (2d Cir. 2002). However, as the parties acknowledged during oral argument, if Baker had effectively assigned its rights under the sub-charter to Adora before the EFT was initiated, then the EFT was not Baker's property and the attachment must be vacated. The parties also agreed at oral argument that whether Baker had effectively assigned its rights to Adora was a question to be decided under English law, as called for in the Deed of Assignment. The Court now turns to this question.

6

B.     The Property Belongs to Adora, not Baker

Not surprisingly, the English solicitors retained separately by Egyptian and Adora

disagree as to whether Baker effectively assigned its rights under the sub-charter to

Adora.  In his declaration on behalf of Egyptian, solicitor Laurence Marron opines that

pursuant to section 136 of the English Law of Property Act of 1925 ("Property Act"), the

assignment of a debt owed to an assignor is ineffective unless express written notice of

the assignment is given to the debtor.  (Declaration of Laurence Marron dated March 21,

2008 ("Marron Decl.") ¶¶ 5-6.)  Without citation to authority, Mr. Marron continues,

"under English law, the essential requirements in all notices of assignment are that the

notice must be clear and unambiguous and expressly or implicitly record the fact of an

assignment and must clearly indicate to the debtor that by virtue of the assignment, the

assignee is entitled to receive the money."  (Id. ¶ 7.)  He concludes that nothing in this

record demonstrates that Louis Dreyfus was given sufficient notice of the purported

assignment.  (Id. ¶ 8.)

Specifically, Mr. Marron believes that the March 5, 2008 letter from Baker to

Louis Dreyfus was not a valid notice of assignment because "there is no mention of the

word 'assignment' in that communication.  Rather, that letter . . . was simply an

instruction for payment, not a notice of assignment, and as such would not satisfy the

requirements of s136 of the statute for the purposes of transferring legal title to the

funds."  (Id.)

For its part, Adora submits the declaration of solicitor Benjamin Horn, who agrees

that a debtor must be given notice in order for a statutory assignment of the debt to be

effective, but opines that "[t]he relevant notice . . . need not be formal . . . and need not be

7

written with the intention that it should perform the function of giving notice."

(Declaration of Benjamin Horn dated March 25, 2008 ("Horn Decl.") ¶ 5.) Citing

Denney, Gasquet, & Metcalfe v. Conklin, (1913) 3 K.B. 177, and Van Lynn Devs. Ltd v.

Pelias Const. Co. Ltd, (1969) 1 Q.B. 607, Mr. Horn argues that the March 5, 2008 letter

gave Louis Dreyfus sufficient notice. (Horn Decl. ¶¶ 5-8.)

In the alternative, Mr. Horn states that even if the requirements of the Property

Act were not met, on the facts of the case Adora was an equitable assignee of Baker's

rights under the sub-charter. (Id. ¶¶ 10-15.) He asserts that in the case of an equitable

assignment, no notice need be given to the debtor for the assignment to be valid and to

prevent a third party from claiming any interest in the debt through the assignor. (Id. ¶

13-14 (citing Holt v. Heatherfield Trust, (1942) 2 K.B. 1, and United Bank of Kuwait v.

Sahib, (1995) 2 All E.R. 973).) On behalf of Egyptian, Mr. Marron does not dispute that

equitable assignments are effective against third parties in Egyptian's position even

without notice to the debtor, but simply states that he possesses "insufficient papers to be

able to come to any firm conclusion" as to whether an equitable assignment occurred in

this case. (Marron Decl. ¶ 9.) The Court finds that Adora has the stronger argument on

both points.

       1.    *Statutory Assignment*

Under English law, in order for a statutory assignment to be valid (1) it must be

absolute, (2) it must be in writing under the hand of the assignor, and (3) express notice

in writing must be given to the debtor. Property Act § 136; Chitty on Contracts § 19-007

(29th ed. 2004) ("Chitty"). There is no dispute that the Deed of Assignment executed by

Baker and Adora meets the first two elements.

8

absent from the communication). Because the March 5, 2008 letter gave Louis Dreyfus

sufficient notice that Baker's interest in the freight payment had been transferred to

Adora, the assignment appears to be effective pursuant to the Property Act. Therefore,

Egyptian has not met its burden of demonstrating that the restrained EFT was Baker's

property and the attachment should be vacated.

### 2. *Equitable Assignment*

Alternatively, regardless of whether the March 5 letter gave sufficient notice to

render the assignment effective under the Property Act, Baker retained no interest in the

freight payment because Adora was an equitable assignee of Baker's interest. An

equitable assignment occurs under English law when an assignor, with an intent to

transfer his right to a chose in action, informs the assignee that the right is so transferred.

Chitty § 19-021; Phelps v. Spon-Smith & Co., (2001) B.P.I.R. 326 ¶ 36 ("It is not

necessary for an equitable assignment to follow any particular form, but it is essential that

there should be an intention to assign and . . . some act by the assignor showing that he is

passing the chose in action to the supposed assignee."). In this case, the Deed of

Assignment clearly evinces an intent on the part of Baker to transfer its interest in freight

payments under the Louis Dreyfus sub-charter to Adora. Although notice to the debtor

that an assignment has occurred is desirable from the assignee's point of view for several

reasons,[1] it is not a requirement of an equitable assignment, which is effective to cut off

---

[1]  For example, if notice is not given to the debtor, he is entitled to continue treating the assignor as his
creditor and to discharge his debt by paying the assignor rather than the assignee. (See Marron Decl. ¶ 9
("[T]he failure to give notice of the assignment to Louis Dreyfus would seriously prejudice the title of
[Adora], as equitable assignee, since . . . an equitable assignee is bound by any payment which the debtor
[Louis Dreyfus] may make to the assignor [Baker] in ignorance of the assignment.").) See also, Chitty
§ 19-020.

10

the rights of the assignor once intention to assign is communicated to the assignee. Holt, 2 K.B. at 4-5; Chitty §§ 19-020, 19-021.

Further, with exceptions inapplicable here, when an equitable assignor's interest in a debt is cut off, so is the ability of the assignor's creditors or other persons attempting to claim the debt through him to attach the debt. Holt, 2 K.B. at 6; Chitty §§ 19-057, 19-066 ("[A] creditor cannot . . . attach any debt already assigned by the assignor."). In this case, Egyptian has attached the freight payments as security for a potential future judgment in its favor against Baker. In other words, Egyptian claims the payment as a potential judgment creditor of Baker's. However, because Baker's interest in the freight payments was cut off by the equitable assignment, Egyptian's ability to attach the freight payments was also destroyed.

Because Mr. Horn's analysis is persuasive, the Court holds that even if the March 5, 2008 letter was insufficient notice to create a statutory assignment, Adora, as an equitable assignee of the freight payment, owned the EFT restrained by Citibank. (See Horn Decl. ¶¶ 11, 13-15). Therefore, Egyptian has not carried its burden of showing that the requirements of Rule B have been met.

### 3. *Clerical Error*

Finally, Egyptian's argument that "[Baker's] interest in the [EFT] attached at Citibank is irrefutable since [*Baker*] *was the named beneficiary on the EFT*," (Mem. of Law in Opposition to Mot. to Vacate at 8) (emphasis in original), need not long detain the Court. It is uncontested that Louis Dreyfus directed its bank to route the EFT to a bank account owned by Adora and not by Baker. There is nothing in the record to suggest that the inclusion by Louis Dreyfus of Baker's name in the EFT instructions was anything

other than a simple clerical mistake. Indeed, Adora has submitted evidence that Louis

Dreyfus attempted to correct the EFT instructions within a day of the transfer, but too late

to avoid the interception of Adora's funds by Citibank in New York. Egyptian cites no

authority for the proposition that an entity with no interest in an EFT under the terms of a

prior assignment to a third party somehow gains such an interest when the party initiating

the EFT mistakenly names that entity as the transaction's beneficiary. Under these

circumstances, the Court concludes that Egyptian has not met its burden of demonstrating

that the EFT belonged to Baker rather than Adora.

## III.    CONCLUSION

For the reasons set forth above, Adora's motion is granted and the restraint by

Citibank of $127,755.79 belonging to Adora pursuant to the March 3, 2008 maritime

attachment in this action is hereby vacated.


Dated: New York, New York
      April 14, 2008

SO ORDERED:

Sidney H. Stein, U.S.D.J.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

EGYPTIAN NAVIGATION CO.

                   Plaintiff,

         - against -

BAKER INVESTMENTS CORPORATION and
BAKER INTERNATIONAL GROUP

                Defendants.

-----------------------------------------------------------X

**ECF CASE**

08 Civ. 02080 (SHS)

## DECLARATION OF MARK WINGATE JONES IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY OF EXECUTION OF ORDER VACATING MARITIME ATTACHMENT

MARK WINGATE JONES of Stone Chambers, 4 Field Court, Gray's Inn, London WC1R 5EF, hereby declares pursuant to 28 U.S.C. Section 1746:

**Introduction**

1.  I am a barrister at the English Bar.  I am a tenant at Stone Chambers of the above the address.

2.  I make this Declaration in support of ENC's motion for a stay of execution of the US Court's Opinion and Order (entered on 14 April 2008) vacating the maritime attachment of certain funds restrained by Citibank.

3.  I have been provided with the following materials:

    a.  Affirmation of Antonis Lemos (14 March 2008)

    b.  Affirmation of Phillipos Gallanis (14 March 2008)

1

    c.  Declaration of Laurence Marron (21 March 2008)

    d.  Declaration of Benjamin Horn (25 March 2008)

    e.  Decision of Judge Stein (14 April 2008)

4. I have also been made aware of the facts of the case on a more general level by Messrs Laurence Marron Solicitors (the English solicitors acting for ENC in the London arbitration). I have also seen copies of the various submissions made in the London Arbitration.

5. I have been asked to comment on the English legal aspects of the case, and in particular on the effectiveness or otherwise of a purported assignment made by Baker to Adora of various sub-freights. I confirm that, as an English barrister, I am competent to do so. I have sought to limit the views expressed below to matters of English legal principle, and to avoid usurping the role of the US Court in applying those English legal principles to the facts of this case. I have also not sought to examine the merits of the parties' position in full in light of the nature of the application before the US Court. If so instructed, I will gladly expand on the views expressed below for the purposes of the appeal lodged against the decision of Judge Stein.

## Overview of the relevant issues – a 'road map'

6. With the greatest of respect to all concerned, it seems to me that the analysis carried out thus far has not focussed on the key issues in this case.

7. In my opinion, the following short summary of legal principle provides a logical 'road map' for dealing with the issues that arise:

    a.  The correct starting point is the identification of the rule in 'Holt';

    b.  The application of the rule in 'Holt' depends on the effectiveness of the purported assignment as between Baker (assignor) and Adora (assignee). Whether the

2

purported assignment qualified as a 'statutory assignment' under s.136 of the Law of Property Act is irrelevant, as is the issue of notice to the debtor.

c. The important distinction in this case is that between an actual 'equitable assignment' on the one hand, and an 'agreement to assign' on the other.

d. It is not possible to transfer something which does not exist, and so the subject matter of an actual 'equitable assignment' cannot be a mere expectancy.

e. A purported assignment of an expectancy might take effect so as to trigger the rule in 'Holt' if it can be, and is, construed as an 'agreement to assign' that expectancy.

f. Equity will elevate an 'an agreement to assign' an expectancy beyond a mere matter of contract so as to bring the rule into 'Holt' into play if that contract is specifically enforceable and supported by valuable consideration.

g. In the absence of valuable consideration, equity will not intervene, and thus – in this case - there would have been no prior transfer of the right to the sub-freights so as to defeat the Rule B attachment.

## The rule in 'Holt'

8. An assignment which is valid against an assignor will generally be valid against the assignor's creditors. Thus, as a general rule, a creditor cannot attach any debt already assigned by the assignor. (Chitty on Contracts (29th ed., 2004, as updated to 31 July 2007 by the 4th Cum. Supp.), para. 19-066; Holt v Heatherfield Trust Ltd [1942] 2 KB 1)

9. Holt is an example of how the English court treats the interplay between an otherwise effective assignment of a chose in action and a particular remedy available to a third party in relation to that same chose in action – i.e. a garnishee order. As explained in Holt, an English garnishee order only charges property with which the assignor could "honestly deal", and so a valid equitable assignment made before the garnishee order will take priority. The interplay depends on the nature of both the assignment and the particular

remedy in question. I am not competent to comment on the nature of a Rule B attachment, and so cannot legitimately comment further.

10. I trust, however, that the US Court has enough information before it regarding the rule in 'Holt' to resolve the point in the context of a Rule B attachment.

**Was there an actual assignment between Baker and Adora?**

11. The question then becomes: was there a valid actual assignment as between assignor and assignee?

12. At paragraph 11 of his Declaration, Mr. Horn states that, in his view, the Deed of Assignment (dated 22 February 2008) "clearly constitutes a valid equitable assignment." With respect, I disagree.

13. The obvious starting point is the Deed itself: on its true construction, what does it purport to do?

14. The Deed is dated 22 February 2008, and expressly provides that it was to take effect on that date.

15. The purported assignment is set out in Clause 1, which provides (sic):

"The Assignor hereby assigns to the Assignee with full title guarantee irrevocably and absolutely the following property, rights, claims and liberties:

(a) the sub freights (Earnings) from the sub charter of the vessel Djebel Refae to Louis Dreyfus estimated to be in the sum of USD 120,000;

(b) All other sub freights (Sub Freights) from subsequent fixtures of the vessel Djebel Refae until the Debt has been repaid in full."

16. Thus, the Deed purports to assign the **actual** sub freights from the current sub charter (Clause 1(a)) and the **actual** sub freights from subsequent fixtures (Clause 1(b)).

4

17. This gives rise to a problem.

18. A future chose in action is incapable of assignment in the strict sense. Without wishing to sound trite, it is impossible to give away that which does not yet exist. As a result, a purported assignment of a future chose in action could only operate as an agreement to assign, and such an agreement requires consideration (Chitty 19-027, see further below).

19. Despite the apparently clear logic of the aforesaid principle, the English case law blurs the concept such that the distinction between an existing chose in action (which is capable of immediate actual assignment), and a future chose in action (which is only capable of being the subject of an agreement to assign), is actually one of some difficulty. On the one hand, it is clear that a mere expectancy, not based on any existing legal right, can be nothing more than a future chose in action, and cannot, therefore, be transferred without consideration. Thus there cannot be an actual assignment of sums which the assignor hopes to receive under a contract not yet made. On the other hand, there are cases that suggest that sums which are certain to become payable in the future under an existing contract are not treated for this purpose as future choses in action. The most difficult cases seem to be those in which there is an existing legal obligation (e.g. under a contract), but it is uncertain whether anything will become due under it in the future, either because the obligation is conditional or because it may be terminated. It is also important to note that even where there is an existing chose of action which is capable of actual assignment, the proceeds of that chose in action may constitute only an expectancy. (See the discussion at Chitty 19-028 to 19-030.)

20. For present purposes, I do not propose to address the case law in detail. Suffice to say that the case law on this topic is not clear – indeed there is an apparent and unfortunate failure in some of the older cases to distinguish between an actual transfer by assignment and a specifically enforceable contract to transfer by assignment (as noted at Chitty 19-033), with both being referred to simply as 'equitable assignments'. While, as a matter of principle, the former can be readily identified as an 'equitable assignment'; the latter is a different creature.

5

21. In my opinion, while there is clearly ample scope for debate as to the case law, there is a good argument based on principle – and indeed logic – that it is only possible to actually assign a chose in action that already exists. A purported assignment of a chose in action that does not yet exist can only operate by way of an agreement to assign.

22. With those principles in mind, it is necessary to look again at precisely what Clause 1 of the Deed does, and does not, purport to do.

   *(1) Clause 1(a) purports to transfer the __actual__ sub-freights from the current sub-charter of the vessel.*

23. While I do not wish to usurp the role of the US Court in applying the principles discussed above, I would respectfully draw the following points to the Court's attention.

   a. Mr. Lemos states that the sub-charter of the vessel to Louis Dreyfus was agreed on 20 February 2008 (Lemos/3), and purports to attach a copy of the charter (as Exhibit A).

   b. The recap at Exhibit A does not of itself indicate when and how any freight was to be earned. Presumably such details are to be found in the "DJEBEL/DREYFUS FIXTURE VOYAGE MALTA/TUNISIE – C/P DTD 23/11/2007", a copy of which was not provided by Mr. Lemos. However, even if the charter included a term stipulating that freight was deemed earned on loading, it seems beyond reasonable doubt that loading would have taken place on 24 February 2008 at the earliest – note that the recap states that the laycan is to be "L/C 24/29 FEB 2008"

   c. It therefore would seem to follow that Clause 1(a) was purporting to assign a chose in action that did not exist as at 22 February 2008.

   d. Further, while the document at Exhibit A does appear to be a fixture recap, it is not clear whether it records the final fixture of the vessel. I note in particular that the recap is expressed to be "SUB STEM – CHRTS RECONFIRMATION W/IN 4 WORKING HRS AFTER CLEANED FIXED FROM OWNRS SIDE". Mr.

6

Lemos does not say when, if ever, the reconfirmation was in fact provided. Although it seems clear that the voyage was actually undertaken and hence that the sub-charter would be treated as having been entered into at some point, it is not clear precisely <u>when</u>. For example, it may be that the sub-charter only actually became binding at some point after 22 February 2008; possibly on arrival at the load port, or tendering of NOR, or even on loading.

e. I raise the uncertainty as to <u>when</u> the sub-charter actually came into existence because of the element of uncertainty in the case law regarding the position in relation to the purported assignment of as yet unearned monies under an existing contract.

*(2) Clause 1(b) purports to transfer the <u>actual</u> sub-freights from subsequent fixtures of the vessel.*

24. Again without wishing to usurp the role of the Court, the position in relation to Clause 1(b) does seem clear: the "subsequent fixtures" did not exist at the time of purported assignment, nor, obviously, did the sub-freights that might be earned thereunder. As such, the purported assignment of the actual sub-freights cannot – it seems to me - stand as an effective assignment.

*(3) Clause 1(a) does <u>not</u> purport to assign the contractual right to the sub-freights if and when they are earned. Nor does Clause 1(b).*

25. If the "Louis Dreyfus" sub-charter did in fact come into being before the purported assignment in the Deed on 22 February 2008, then the contractual right to claim such sub-freights as might become due may have been an assignable right. However, the Deed did not purport to assign such a right.

26. The position is all the more clear in relation to subsequent fixtures which obviously were not in place as at 22 February 2008. There simply were no assignable rights under any such posited future contracts in existence as at 22 February 2008.

7

*(4) Clause 1(a) does **not** purport to be an agreement to assign such sub-freights once they come into existence. Nor does Clause 1(b).*

27. The express words of Clause 1 clearly purport to be an immediate assignment of existing rights – see, for example, "hereby assigns".

28. I should, however, point out that, under English law, the construction of a contractual document such as the Deed involves seeking to determine the parties' intentions in light of the context in which the document was created (which context includes all those things reasonably available to persons in the position of the parties, or actually known to both parties, at the time the Deed was signed). This can mean that a strict literal reading of the words must give way to a more purposive reading – although the process must remain objective, and evidence of the subjective intentions of the parties is only admissible in support of a plea of rectification.

29. The process of construing the Deed is, at root, one for the US Court applying English law principles. Again, without wishing to usurp the role of the Court, I think it is only fair to say that there is a good chance that an English Court would construe the Deed as an 'agreement to assign' the sub-freights if and when they were earned, rather than hold it to have been of no effect at all.

## The effect of an 'agreement to assign'

30. In the absence of assistance from equity, an agreement to assign operates merely as a contract to transfer the chose in action once it comes into existence. It does not, of itself, amount to the transfer of that chose in action. Thus, a third party such as ENC could acquire rights over that chose in action before it was transferred to the assignee, leaving the assignee with only an action for breach of contract against the assignor.

31. However, there is a rule of equity that an agreement for valuable consideration to assign a chose in action that does not yet exist (i.e. an expectancy or future property) can operate to transfer the right to the chose in action as soon as it comes into existence provided only that it is sufficiently identifiable under the agreement. When this doctrine operates, no further action on the part of the assignor is necessary to convert the agreement to assign

8

into an actual assignment. Further, the effect of this equitable principle is that the assignee's interest is more than a matter of mere contract, even before the chose in action comes into existence (Chitty 19-032).

32. The key question that therefore arises is: did Adora give valuable consideration?

*(1) An agreement to assign made by way of a deed*

33. The mere fact that the agreement to assign is made by way of a deed does not satisfy the requirement for valuable consideration in this situation. The fact that the agreement to assign was made by deed would render it an enforceable contract as a matter of English law even absent consideration; however, that of itself would not satisfy equity's demand that a party give valuable consideration before it offers assistance to that party. Equity does not aid a volunteer. (Chitty 19-023, fn 121.)

*(2) The statement in the Deed of Assignment*

34. I note that the 'BACKGROUND' section of the Deed contains an assertion that the assignment is made "for good and valuable consideration the receipt of which is acknowledged."

35. In my opinion, it could be well argued that such a statement would not suffice to satisfy an English court that the equitable doctrine should apply. If Adora is to pray the aid of equity, then it must establish that it gave the valuable consideration that justifies the intervention of equity to turn the agreement to assign into something more. While an English court might be unwilling to let Baker itself resile from the representation made to Adora in the Deed, there would – it seems to me – be no good reason why such an approach should be taken when Adora is seeking to rely on the equitable doctrine in relation to a third party such as ENC. ENC has not made any representation to Adora in relation to consideration, and so there is no reason to fix the conscience of ENC. If Adora wants the aid of equity to defeat the competing interest of ENC, then – in my opinion – there is a good argument that it must be have actually given valuable consideration.

9

*(3) Forbearance to sue*

36. As things stand, no valuable consideration has been identified by Adora (or Baker) in the evidence before the US Court. The Deed itself does not expressly identify any valuable consideration.

37. However, the English Courts have shown a willingness to find valuable consideration in a creditor's forbearance to sue. Indeed, actual forbearance can amount to consideration even though the creditor has not made any express or implied promise to forbear – although the case law on this is conflicting. The editors of Chitty suggest that mere forbearance will amount to consideration where the creditor is virtually certain to take steps to enforce his claim, but that a promise to forbear (express or implied) is necessary where it is problematical whether the claim will ever be enforced – see Chitty 3-057.

38. The key question, however, is whether the creditor has forborne "on the strength of" the debtor's promise. He will clearly have done so where the debtor has expressly requested the forbearance. But such an express request is not necessary - it seems that an implied request will also suffice. However, actual forbearance which is not induced by either the express or implied request of the debtor does not amount to valuable consideration. (Chitty 3-060)

39. Once again, it is for the US Court to decide whether consideration in fact exists in this case; although I would respectfully draw attention to the following points.

    a. Adora – the party praying the aid of the equitable doctrine - has not provided any evidence in this regard;

    b. It is – in my opinion – well arguable that the terms of the Deed itself

        i. tend to suggest that Adora was not making any promise to forbear from suing for the debt owed to it by Baker, and

        ii. do not readily justify the implication of a request by Baker to Adora not to sue for the debt.

On the contrary, the Deed appears to show nothing more than Baker taking steps to pay an outstanding debt in circumstances in which Adora was "unwilling to extend the terms of the Advance". There is nothing to suggest that Adora were giving up the right to sue for the debt at any time. The purported assignment is said to apply "until the Debt has been repaid in full", but this seems to be a qualification as to the upper limit of the amount to be assigned, as opposed to a temporal limit prior to which Adora was not to sue for the debt.

**Conclusion**

40. I hope that this Declaration serves to highlight what I believe to be the relevant issues of English law arising in relation to the Deed of Assignment (in particular) in a fashion that will assist the US Court in its determination of the motion for a stay pending the outcome of the appeal.

41. As I trust is clear from the above, I think that the arguments available to ENC give rise to a substantial possibility of it succeeding on the appeal.

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

By: ...................................................................

MARK WINGATE JONES

Executed on 5 March 2008

11

# EXHIBIT 3

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

EGYPTIAN NAVIGATION CO.

                              Plaintiff,

            - against -

BAKER INVESTMENTS CORPORATION
AND BAKER INTERNATIONAL GROUP

                              Defendants.

---------------------------------------------------------X

ECF CASE

08 Civ. 02080 (SHS)

## DECLARATION OF MOHAMED SHAABAN IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY OF EXECUTION OF ORDER VACATING MARITIME ATTACHMENT

MOHAMED SHAABAN of Egyptian Navigation Company, 2 El Nasr Street, Alexandria, Egypt, hereby declares pursuant to 28 U.S.C. Section 1746:

1.    I am the insurance and claims manager at Egyptian Navigation Company ("ENC"), the plaintiff in this action. I am fully aware of the facts of this matter as I am handling it in the offices of ENC in Alexandria, Egypt. I am the same Mohamed Shaaban who filed a declaration in this action on 21 March 2008. I submit this declaration in support of the ENC motion for a stay of execution of the order vacating the maritime attachment in favour of interested party ADORA INVESTMENTS INC ("Adora"). I am authorized to make this declaration on behalf of ENC.

2.    As I stated in my declaration dated 21 March 2008, ENC is currently pursuing a claim in arbitration in London against the defendant Baker Investments Corporation

i

("BIC"). ENC made further submissions in that arbitration on 27 April 2008. The total claimed by ENC in that London arbitration has been increased to US$307,045.21 plus Euros 8,496 plus interest and costs. It is ENC's case that US$128,060.86 of the principal claim is undisputed and ENC has asked the arbitrators to proceed to an interim award in respect of the undisputed amount. BIC has an opportunity to reply to the latest ENC submissions.

3. BIC is pursuing counter-claims against ENC in the London arbitration for three alternative amounts -- US$412,500, US$793,150 or US$959,603.20. The BIC claims are secured with a bank guarantee for US$1,247,000 in favour of BIC following the arrest by BIC of the ENC vessel AL MINUFIYAH at Flushing, Netherlands, in March 2008.

4. By contrast, apart from the maritime attachment which is the subject of this action, ENC has no security for its claims against BIC currently being pursued in the London arbitration. BIC is a Marshall Islands registered company operated from Piraeus, as confirmed by the attached correspondence I received from BIMCO on 14 April 2008 (1 page) and 30 April 2008 (2 pages). BIC has no available assets to secure the ENC claims or to satisfy any favourable arbitration award. As BIC is an offshore company, I doubt that ENC will now locate any BIC assets. If the ENC motion for a stay of execution of the order vacating the maritime attachment is denied, serious prejudice would be caused to ENC's claims in the London arbitration.

5. I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _Mohamed Shabaan_
MOHAMED SHAABAN

Executed on 5 May 2008

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

EGYPTIAN NAVIGATION CO,

                                    Plaintiff,

                    - against -

BAKER INVESTMENTS CORPORATION
AND BAKER INTERNATIONAL GROUP

                    Defendants,

------------------------------------------------------------X

ECF CASE

08 Civ. 02080 (SHS)

## ATTACHMENTS REFERRED TO IN THE DECLARATION OF MOHAMED SHAABAN DATED 5 MAY 2008

----- Original Message -----
**From:** Michael Frangos
**To:** INSURANCE
**Sent:** Monday, April 14, 2008 4:04 AM
**Subject:** RE: Vessel & Charterer Information

Dear Mr. Elshelmy,

We have found their website: www.bakerintercorp.com where you can read about their activities.

However, according to the local telephone directory, there is no Baker Investments Corp registered in Greece and the given phone nos. are not registered to any company/person. The fax number belongs to 'Adonios D. Lemos - Maritime Works'. That is the only number listed under that company.

Having checked the vessels given for references, we regret to advise that it is difficult to trace the correct vessel as there have been several vessels by these names.

We would suggest that you tread carefully in your dealings with that company.

Best regards
**B I M C O**

Michael Frangos
Manager, Services Department

E-mail: mf@bimco.org
Tel.: +45 4436 6800
Fax: +45 4436 6868
Web: www.bimco.org

----- Original Message -----
**From:** Ivan Hebnes
**To:** ins_enc@dataxprs.com.eg
**Sent:** Wednesday, April 30, 2008 5:53 AM
**Subject:** company information

**To: Egyptian Navigation Co., Alexandria**
**Reg. No. 103926**
**Att.: Mr. Shaaban**
**Fm: BIMCO Copenhagen**


Dear Sirs,

**Company information**

We refer to your e-mail of this afternoon and have to say initially that most companies located in the tax-haven Marshall Islands are off-shore registered companies operated from elsewhere. They do not have a physically manned office with personel at the off-shore location. The company is merely a letterbox. The business of off-shore registered companies are conducted from elsewhere by others who usually present themselves "as [non-responsible] agents only".

BIMCO does not record information about off-shore registered companies. We only record information about physically existing companies with offices and personel.

In the case of Baker Investment, we were lucky to identify the company's physical operator as "Adonios D. Lemos - Maritime Works" in Piraeus as we advised 14 April.

As always, when contemplating doing business with off-shore companies, we suggest that the physical operators be identified and that they issue a performance guarantee acceptable to your bankers.

Unfortunatley, we have been unable to trace anything about the off-shore registered company "Adora Investment Inc." of Marshall Islands, just as the information provided does not enable us to identify the company's physical operators who, apparently, is located at 81, Akti Miaouli, Piaeus, together with a number of companies engaged in the maritime industry.

If you can advise the name, address and communication numbers of the company physically operating Adora Investment Inc., we shall endeavour to investigate their background.

Best regards,
**Ivan Hebnes**
**B I M C O**
Voice Direct: +45 44 36 68 52
Fax (Services Dpt.).: +45 44 36 68 68
E-mails: Direct: ih@bimco.org
Department: services@bimco.org
Web site: http://www.bimco.org

1

CERTIFICATION

Rahul Wanchoo, an attorney admitted to practice before this Honorable Court, certifies that on this 5th day of May, 2008, a copy of the foregoing Memorandum of Law was served via email to the following counsel of record:

LYONS & FLOOD, LLP
Attorneys for ADORA INVESTMENTS INC.
65 West 36th Street, 7th Floor
New York, New York 10018

Attn:   Kirk M. Lyons, Esq.
        Jon Werner, Esq.

_____
Rahul Wanchoo

9