UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X


EGYPTIAN NAVIGATION CO.

<u>ECF CASE</u>

Plaintiff,

08 Civ.02080 (SHS)


-against-


BAKER INVESTMENTS CORPORATION and

BAKER INTERNATIONAL GROUP

Defendants

-------------------------------------------------X



<u>DECLARATION OF EMMET PAUL COLDRICK</u>



Emmet Paul Coldrick of 10 Fleet Street, London EC4Y 1AU, United Kingdom hereby

declares pursuant to 28 USC Section 1746:


**<u>Introduction</u>**

1.  I am a barrister, qualified in England and Wales.  I am a tenant at the Chambers
    of Lionel Persey QC and Simon Rainey QC, Quadrant Chambers, of the address
    that I have given.


2.  I have been asked by Lyons & Flood LLP of New York, attorneys for Adora
    Investments Inc., to give my opinion on certain issues of English law and in
    particular on the matters raised by Mark Wingate Jones in his Declaration dated

5th March 2008 (which I suspect may have been intended to have been dated 5th May 2008).

3.  I confirm that, as a barrister practising English commercial and maritime law, I am competent to give an opinion on the issues of English law that have arisen and in particular on the matters addressed by Mr Jones.

4.  I have read:

(1) the Opinion and Order of Sidney H. Stein, United States District Judge, dated 14th April 2008;

(2) the Declaration of Mr Jones to which I have referred;

(3) the Declaration of Laurence Marron dated 21st March 2008;

(4) the Declaration of Benjamin Horn dated 25th March 2008;

(5) the Affirmation of Antonis Lemos dated 14th March 2008 and its exhibits;

(6) the Affirmation of Phillipos Gallanis dated 14th March 2008 and its exhibits;

(7) the Declaration of Mohamed Shaaban dated 5th May 2008 and its attachments;

(8) the Memorandum of the Law Offices of Rahul Wanchoo dated 5th May 2008;

(9) the Affirmation of Phillipos Gallanis dated 20th May 2008;

(10)    the Affirmation of Antonis Lemos 22nd May and its exhibitl.

5.  I adopt and use below the expressions – Baker, Egyptian, EFT and so forth – defined/used by Judge Stein in his Opinion.

**Summary of conclusions**

6.  For the reasons I give below, in my opinion:

   (1) as a matter of English law, it is possible immediately to assign by deed rights to sums of money that are payable in the future under an existing agreement;

   (2) accordingly, clause 1(a) of the deed of assignment was effective as an immediate assignment of Baker's right to freight under the Louis Dreyfus charter;

   (3) but if I am wrong in that, at a minimum clause 1(a) of the deed of assignment would be given effect by an English court as an agreement to assign, specifically enforceable in equity as an assignment if consideration for the agreement was present;

   (4) actual forbearance from suit is adequate consideration for an agreement to assign and the facts appear to be such as would amount to actual forbearance from suit as a matter of English law;

   (5) it would appear that, regardless of any assignment, the funds attached are Adora's property;

   (6) but if I am wrong in that and, absent an assignment, they would be Baker's property, they are subject to a valid assignment in Adora's favour.

**The matters addressed**

7. I see that Judge Stein has formed a clear opinion on the English law matters already addressed to him by Egyptian and by Adora – *inter alia* notice requirements for statutory assignments under the Law of Property Act 1925 and the general principles of assignment in equity – and that Mr Jones does not address those matters as such.  Rather, he addresses a matter not discussed by Mr Marron or Mr Horn in their Declarations, namely whether the deed of assignment was ineffective because (according to Mr Jones) it seeks to assign something that did not exist at the time the deed was executed.

8. Except as explained immediately below, I will confine my comments to the particular matters raised by Mr Jones.  I would be happy to expand upon my comments or to address any further issues of English law if asked to do so.

**Apparent irrelevance of the assignment**

9. At the outset, I should make it clear that, to the eyes of this English lawyer, it is difficult to see how, in light of the evidence and the facts found by Judge Stein, the validity/ effectiveness of the assignment can be decisive.

10. As I understand it, the funds attached rest with Citibank on their way (but for the attachment) to an account in the name of Adora with EFG Eurobank Ergasias SA in Athens, Greece.  There was a clerical mistake as regards the naming of the beneficiary on the EFT form but – as I read Judge's Stein's Opinion and as I understand the evidence – not as regards the account (of Adora) into which the funds were instructed by Louis Dreyfus to be paid.  Baker had instructed Louis Dreyfus to pay Adora and that is what Louis Dreyfus intended to do.  There is, as far as I am aware, no evidence (at least apart from the clerical mistake referred to by Judge Stein) that anyone intended that the funds that have been attached were not to be transferred to Adora beneficially.

11. Thus, even absent any assignment, it would appear that this was a transfer of funds to Adora.  True, it was a transfer which would both discharge Louis

Dreyfus's debt to Baker under the sub-charter (Baker having effectively agreed as much by giving the payment instruction it gave) and reduce Baker's debt to Adora (at a minimum, it seems to me that the deed of assignment required Adora to accept sub-freight payments sent to it in (part) discharge of Baker's debt). But the *payment itself* was to Adora absolutely. Accordingly, if the appropriate question for the Court, focusing on whose intangible personal *property* are these funds, is "who (absent the attachment) is entitled to these funds?", the answer, it seems to me, must surely be Adora, not Baker, regardless of any assignment.

12. I appreciate that the above may touch upon issues governed by US law. But it seems to me necessary to mention the point as I would not wish to leave the Court with the impression that I believe that Adora needs to prove the assignment in order to succeed. For reasons I explain below, I am of the opinion that the deed for assignment was effective in all material respects. Thus, had the funds been on their way to *Baker*, it is my opinion that they were subject to a valid assignment in favour of Adora. But as they were in fact on their way to *Adora* (beneficially), in my opinion the question of the assignment's validity does not even arise – these were Adora's funds.

13. That said, I shall turn now to the deed of assignment.

**Common ground**

14. I agree with Mr Jones on several of the issues he raises. 5 substantial points of agreement are as follows.

(1) I agree with his synopsis, at paragraphs 8 and 9 of his Declaration, of what he labels *"the rule in Holt"*, referring to Holt v Heatherfield Trust Limited [1942] 2 KB 1.

(That said, I disagree with his observation at paragraph 7(a) that *"[t]he correct starting point is the identification of the rule in 'Holt'"*. The rule in Holt is a rule of English law addressing the question of whether a

creditor can attach a debt that has been assigned to a third party.  But in this case, that (as I think Mr Jones himself recognised at his paragraphs 9 and 10) is a matter for US, not English, law.)

(2) I agree with Mr Jones (see his para. 24) that in English law clause 1(b) of the deed was not an effective assignment of (as opposed to agreement to assign) freight under subsequent fixtures.

(I must add, however, that as I understand the evidence the Court is concerned with whether the payment that was attached was subject to an equitable assignment/enforceable agreement to assign under clause *I(a)* of the deed, which deals with the Louis Dreyfus fixture.)

(3) I agree with Mr Jones (see his paras. 27 to 29) that the wording used in the deed  suggests an intention to effect an immediate assignment of rights (although in the case of clause 1(b), I would not say "existing rights" – I cannot see that the parties could be said to have regarded freight under *subsequent* fixtures as an existing right) but that *"there is a good chance that an English Court would construe the Deed as an 'agreement to assign' the sub-freights if and when they were earned, rather than hold it to have no effect at all"*.

(I do not know whether *"good chance"* in the above is intended to suggest that it is more likely than not that an English Court would construe clause 1(b) of the deed as an agreement to assign, capable of effect, rather than as an attempt to do the impossible (effect immediate assignment of something that does not (yet) exist under a contract that does not (yet) exist).  In my opinion, clause 1(b) of the deed would more likely than not be construed as an agreement to assign for that reason – an English Court would, I think, be very reluctant to conclude that commercial parties had truly agreed to do the impossible.)

(4) I agree with Mr Jones's summary in paragraphs 30 and 31 of the effect of an agreement to assign.

(5) I agree with Mr Jones (at his para. 33) that an agreement to assign must be supported by valuable consideration if it is to operate as an actual equitable assignment once the chose in action in question comes into existence.  I also agree that the mere fact that an agreement to assign was made by deed does not satisfy this requirement.

**The deed of assignment**

15. It seems to me that the first question to ask and to answer is: what is it that the deed, objectively construed, was intended to do?  The operative part of the deed provides:

> *"The Assignor hereby assigns to the Assignee with full title guarantee and absolutely the following property, rights, claims and liberties:*
> *(a) the sub-freights (Earnings) from the sub charter of the vessel Djebel Refaa to Louis Dreyfus estimated to be in the sum of USD 120,000;*
> *(b) All other sub freights (Sub Freights) from subsequent fixtures of the vessel Djebel Refaa until the debt has been repaid in full."*

16. As the deed is governed by English law, its true construction is a matter of English law.  The following explanation of Lord Steyn, in <u>Sirius International Insurance Co v. FAI General Insurance Ltd</u> [2004] 1 WLR 3251 (House of Lords) at 3257 para. 19, of the proper approach to construction of a commercial instrument states the current English law.

> *"There has been a shift from literal methods of interpretation towards a more commercial approach. In* Antaios Compania Naviera SA v Salen Rederierna AB  *[1985] AC 191, 201, Lord Diplock, in an opinion concurred in by his fellow Law Lords, observed: "if detailed semantic and syntactical analysis of a word in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense." In*  Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd  *[1997] AC 749, 771, I explained the rationale of this approach as follows:*

*"In determining the meaning of the language of a commercial contract ... the law ... generally favours a commercially sensible construction. The reason for this approach is that a commercial construction is more likely to give effect to the intention of the parties. Words are therefore interpreted in the way in which a reasonable commercial person would construe them. And the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language."*

17. In the <u>Mannai Investment</u> case, Lord Hoffmann stated as follows at 775C to F:

*"It is of course true that the law is not concerned with the speaker's subjective intentions. But the notion that the law's concern is therefore with the "meaning of his words" conceals an important ambiguity. The ambiguity lies in a failure to distinguish between the meanings of words and the question of what would be understood as the meaning of a person who uses words. The meaning of words, as they would appear in a dictionary, and the effect of their syntactical arrangement, as it would appear in a grammar, is part of the material which we use to understand a speaker's utterance. But it is only a part; another part is our knowledge of the background against which the utterance was made. It is that background which enables us, not only to choose the intended meaning when a word has more than one dictionary meaning but also, in the ways I have explained, to understand a speaker's meaning, often without ambiguity, when he has used the wrong words.*

*When, therefore, lawyers say that they are concerned, not with subjective meaning but with the meaning of the language which the speaker has used, what they mean is that they are concerned with what he would objectively have been understood to mean. This involves examining not only the words and the grammar but the background as well."*

18. In my firm opinion therefore, an English court would approach the construction of the deed in a manner which:

    (1) accords with business common sense;

    (2) is hostile to technical interpretations and undue emphasis on niceties of language;

    (3) takes into account the commercial background in coming to understand what is intended (even if wrong words have been used);

(4) is ultimately concerned with what the parties, as (presumptively) sensible business men, would have been objectively understood to mean.

19. Bearing the above in mind, in my opinion an English court would, insofar as is reasonably possible, seek to give the deed the effect it was clearly intended to have – that is to assign *"property, rights, claims and liberties"* (i.e. sub-freights due under fixtures of the vessel "Djebel Refaa") otherwise payable to Baker to Adora.

20. Hence, in my opinion an English court would not construe the deed in a technical manner, focusing on the distinction Mr Jones apparently seeks to draw between, on the one hand, "actual" freights (his para. 16) (by which I understand him to mean accrued rights to a particular sum of money arising under a sub-charterparty) and, on the other hand, the <u>existing</u> contractual right to such freight as will become payable, pursuant to the terms of the sub-charterparty, on performance of the sub-charterparty (see his reference in para. 19 to existing legal obligations only due in the future).

21. Rather, I expect an English court would construe clause 1(a) as an actual assignment of the <u>existing</u> contractual right, under the Louis Dreyfus sub-charterparty, to such freight as falls due on performance of the agreement. I agree with Mr Jones that the wording "hereby assigns" strongly suggests an intention immediately to assign; see his para. 27. Moreover, particularly given the broad wording used in the deed – *"property, rights, claims and liberties"* – it seems to me that it would flout business common sense to read clause 1(a) as failing to assign any existing contractual right to freight.

22. As regards clause 1(b), however, a Court construing and seeking to give practical effect to the parties' manifest intention to assign sub-freight under subsequent fixtures would be inclined to read that provision as an agreement to assign. Whereas, clause 1(a) refers to an <u>existing</u> fixture and so an <u>existing</u> contractual right to freight (albeit in a sum not yet ascertained and conditional

upon the due performance of the sub-charterparty), clause 1(b) clearly refers to rights that do not yet exist – rights under subsequent fixtures – and so must be a mere agreement to assign.  It would be unreal to regard clause 1(b) as attempt to assign rights the parties thought already existed but in fact did not exist.  An English Court would not have such a dim view of commercial parties as to take them to intend immediately to assign rights that do not exist.  Rather, the parties would be taken to have agreed to assign the rights in question once they accrued.

23. That being so, it is possible that the reading of clause 1(b) as an agreement to assign might affect the Court's approach to construing clause 1(a).  I suppose the argument would be that if clause 1(b) is a mere agreement to assign, so must clause 1(a) be a mere agreement to assign.  However, in light of the principles of construction to which I have referred, that is not a good argument in my view.

24. As I have noted, Mr Jones says at his paragraph 29, *"there is a good chance that an English Court would construe the Deed as an 'agreement to assign' the sub-freights if and when they were earned, rather than hold it to have no effect at all"*.  In the case of clause 1(b), I would put it higher than that, as any other construction of that clause would render the clause wholly ineffective and that, it seems to me, would flout business common sense.

25. So, in conclusion on the construction of the assignment, in my opinion:

    (1) given the words used and the apparent intention to effect an immediate assignment, an English court would be inclined to give clause 1(a) effect as an immediate assignment of the right to freight (as yet unearned) under the Louis Dreyfus charterparty;

    (2) on the other hand, however, an English court would be inclined to give effect to clause 1(b) as an agreement to assign rights that do not yet exist;

(3) bearing in mind the principles of construction I have outlined, I believe that a construction of the deed which regards clause 1(a) as an immediate assignment of existing rights, but clause 1(b) as a mere agreement to assign rights as they accrue, is both reasonable and likely;

(4) but there is a possibility that clause 1(a) would be construed as an agreement to assign rights as they accrue, because that is how clause 1(b) is likely to be construed.

**Was there an existing right to assign?**

26. Before turning to the effect of the deed if construed as an assignment, on the one hand, or an agreement to assign, on the other, I perhaps ought to comment briefly on Mr Jones's paragraph 23. There, he addresses the issue of whether a chose in action under the Baker/Louis Dreyfus sub-charterparty existed as at the date of the deed of assignment, 22 February 2008.

27. Mr Jones notes (at para. 23 d.) that the fixture recap (dated 20 February 2008) referred to by Mr Lemos was subject to confirmation. It seems to me that whether or not there was a concluded fixture between Baker and Louis Dreyfus as at 22 February 2008 is plainly a matter of fact for the Court. Mr Lemos's evidence is that there was and his additional Affirmation confirms that and provided documentary evidence in support. Further, clause 1(a) of the deed certainly appears to proceed on that basis that there was a concluded fixture. Accordingly, I have proceeded on the basis that there was a concluded fixture as at the time the deed was executed.

28. Mr Jones also notes (at paragraph 23 b.) that the Court does not have before it evidence as to when freight became due under the sub-charterparty. Again, this is a question of fact and so not for me to address. However, for the reasons I have given at paragraph 19 to 21 above, I must disagree with Mr Jones's statement in his paragraph 23 c. that *"[i]t would seem therefore to follow that Clause 1(a) was purporting to assign a chose in action that did not exist as at 22*

*February 2008"*.  The better view is that clause 1(a) was intended to (and did) assign the <u>existing</u> contractual right to such freight as would fall due on loading, or such other performance as would trigger Baker's contractual entitlement to freight under the sub-charterparty.

### What if clause 1(a) is an actual assignment?

29. If, as I believe, on a true construction of clause 1(a) of the deed the parties intended to assign an existing right under the sub-charterparty – namely the right to such freight as would become payable on performance – was that assignment effective as a matter of English law?

30. I agree with much of Mr Jones's summary, at paragraphs 18 to 21 of his Declaration, of the difficult and somewhat unclear state of the English law as to equitable assignment of future choses in action.  However, in my opinion a right to a sum yet to fall due under an existing contract can be assigned.  As I understand his paragraphs 19 and 20, Mr Jones does not express an opinion on the point as such, other than to observe that the case law is difficult and unclear.

31. As this is potentially a key issue, it may be helpful to address in a little detail some of the propositions stated by Mr Jones in his paragraph 19, beginning about 7 lines into that paragraph.

    (1) *" ... [T]here cannot be an actual assignment of sums which the assignor hopes to receive under a contract not yet made."*  I entirely agree.  But here the Baker/Louis Dreyfus charterparty had already been entered as at the time of the assignment.

    (2) (a) *"On the other hand, there are cases that suggest that sums which are certain to become payable in the future under an existing contract are not treated for this purpose as future choses in action"*.  I agree.  But I would go further.  In my opinion, the following passage in *Chitty* at para.

19-028 (the beginning of which is reflected in sentence in Mr Jones's Declaration just quoted) states the English law.

"… [S]ums which are certain to become payable in the future under an existing contract or other legal obligation are not treated for this purpose as future choses in action but as existing choses in action. So, for instance, a loan repayable at a fixed future date, or rent payable in the future under an existing lease, is an existing chose in action, and is capable of actual assignment without consideration. So also the right to be paid sums in the future under an existing contract is an existing chose in action even though the precise amounts which will become payable are as yet unascertained, e.g. royalties payable under a patent licensing agreement already made" [emphasis supplied; footnote omitted].

(b) In my opinion, the passage I have underlined above appears to apply on the facts of this case and seems to me to cause considerable difficulties for Mr Jones's apparent distinction between "actual" sub-freights payable in the future, on the one hand, and the existing contractual right to a freight payment on performance of the charterparty, on the other. Even if, on the true construction of the deed, all that was intended to be assigned was "actual" freights (which did not yet exist), where there is an existing contract (here, the sub-charterparty) under which sums will be payable in the future (i.e. the sub-freight), an assignment of those sums will be regarded as an effective assignment of an existing chose in action, regardless of the presence or absence of consideration.

(3) (a) "The most difficult cases seem to be those in which there is an existing legal obligation (e.g. under a contract), but it is uncertain whether anything will become due under it in the future, either because the obligation is conditional or because it may be terminated." This statement is taken by Mr Jones almost verbatim from para. 19-029 of

*Chitty*. *Chitty* goes on to refer to <u>Hughes v Pump House Hotel Co Ltd</u> [1902] 2 KB 190, a case in which the Court of Appeal held, in Chitty's words, *"that sums payable to a builder under an existing contract are an existing chose in action, even though the sums may never become payable if the builder performs the contract"*. *Chitty* then refers to <u>Walker v Bradford</u> <u>Old Bank</u> (1884) 12 QBD 511, a decision of a Divisional Court to the effect that (again this is Chitty's summary at para. 19-029) *"an assignment by a person of sums which will be standing to his credit at his bank at his death is an assignment of an existing chose in action, and therefore needs no consideration, since it is a sum which will become payable under the existing contract between the assignor and the bank"*.

(b) In the <u>Walker</u> case, <u>Brice v Bannister</u> (1878) 3 QBD 569 was cited as authority for the Court's decision. In <u>Brice</u>, the Court of Appeal held (by a majority) that an assignment of monies due *or to become due* under a shipbuilding contract could be validly assigned. Lord Coleridge CJ had reached the same decision at first instance. He had stated (at 573): *"it is argued that, in order to satisfy the terms of the statute to which he has referred* [the Judicature Act 1873]*, the debt must be an existing debt, and an assignment of a debt to become due will not be within the terms of the section. Now that a debt to become due is a chose in action, is clear; and that an assignment of a debt to become due would have been enforced in equity, upon the authorities is clear."*

(c) The other case relied upon in <u>Walker</u> was <u>Buck v Robson</u> (1878) 3 QBD 686, another shipbuilding case and a decision of Chief Justice Cockburn, the headnote of which reads: *"T. contracted with J. to build for him a steam launch for the sum of 80l. , the price to be paid when the boat should be completed and delivered. T., after receiving 40l. on account, addressed a letter to J. as follows: "I hereby assign to Messrs. R. & Son the sum of 40l. now due or <u>that may hereafter become due</u> in*

*respect of the steam launch which I am building for you". Held, that T.'s letter was not an order for the payment of money, but an assignment of a debt, and might be given in evidence on payment of the proper stamp duty and penalty"* [emphasis supplied].

(d) Pausing there, on the strength of the above, it is very difficult to see how these could be regarded as *"most difficult cases"*. On the contrary, they are clear and of one voice: a future chose in action arising under an existing contract is capable of immediate assignment as a matter of English law. Thus, even if Mr Jones's conclusion that clause 1(a) of the deed seeks to assign only future choses in action (as opposed to the existing contractual right to such freight as becomes due), those chose in action are, it seems to me, perfectly capable of immediate assignment, without consideration, as a matter of English law.

(e) The contrary authority that concerns the editors of *Chitty* is, surprisingly, a single Australian decision, <u>Norman v Federal Commissioner of Taxation</u> (1963) 109 CLR 9. Of this case, *Chitty* says: *"it was held by a majority of the Australian High Court that interest payable in the future under an existing loan was a mere expectancy, because the loan (not being made for a fixed period) might have been repaid before the interest became due. It was also held (unanimously) in the same case that dividends which may become due in the future on shares already held in a company also constitute nothing more than an expectancy, and cannot therefore be assigned without consideration"*.

(f) That decision does not, in my opinion, cast any great doubt on the English decisions I have referred to, which include cases decided by the Court of Appeal and so which, as a matter of the English rules of precedent, are binding on all English courts (including the Court of Appeal itself) other than the House of Lords. Quite apart from the fact that <u>Norman</u> was decided in the context of an Australian revenue statute,

it seems to me that it may be distinguishable from the English authorities (perhaps other than <u>Walker</u>).  In <u>Norman</u>, the future sums in issue might not have accrued even if all parties to the relevant agreements performed them in accordance with their terms: as I understand matters, (a) there was no obligation to refrain from redeeming the loans early (and accordingly no future chose in action might have accrued even if the all parties kept to the terms agreed) and (b) there was no obligation to pay any dividend (and so, again, no future chose in action might have arisen). Conversely, in all the cases discussed above (with the exception of <u>Walker</u>), and in this case, a future chose in action (here, freight) was bound to accrue if all parties performed the contract in question.

(g) I conclude therefore that, notwithstanding the <u>Norman</u> case and the doubt that the editors of *Chitty* regard it to cast, as a matter of English law a right, under an existing agreement, to the payment of a sum of money that will accrue in the future, if the agreement in question is duly performed by the parties to it, is capable of immediate assignment.

(4) (a)  *"It is also important to note that even where there is an existing chose of action which is capable of actual assignment, the proceeds of that chose in action may constitute only an expectancy."*  Again, this statement is taken almost verbatim from Chitty (para. 19-30), which is cited by Mr Jones.  *Chitty* cites 2 authorities for this proposition – <u>Glegg v Bromley</u> [1912] 3 KB 474 and <u>Williams v Commissioner of Inland Revenue</u> [1965] NZLR 395.  Taking <u>Williams</u> first, this is a New Zealand tax case.  In my opinion, it does not cast any doubt on the clear English authority I have already discussed.

(b) <u>Glegg</u>, however, is a decision of the English Court of Appeal and so potentially of much greater moment.  But as stated in *Chitty*, <u>Glegg</u> was a case where the purported assignment was of the proceeds of a defamation action, not of a chose in action arising under a contract.

>*Chitty* goes on to state that in <u>Glegg</u> it was merely *assumed* that the
>proceeds were a mere expectancy incapable of assignment. Accordingly,
><u>Glegg</u> does not seem to me to be strong authority for the proposition for
>which it is cited by *Chitty*. In any event, it is difficult to see its relevance
>to the facts of this case or that it could cast any real doubt on the
>authorities I have already referred to at length.

32. For the reasons I have given above if, as I believe, clause 1(a) of the deed was,
on its true construction, intended immediately to assign the existing right to such
sub-freight as would fall due under the sub-charterparty, then, as the sub-
charterparty existed as at the date of the assignment, there was a valid equitable
assignment of that sub-freight by Baker to Adora. The same conclusion seems
to me to apply even if, as I understand Mr Jones to believe, clause 1(a) was
intended to assign the "actual" sub-freight due (in the future) under the sub-
charterparty. The English authorities seem to me to permit such an assignment.

33. Accordingly, any payment of sub-freight by Louis Dreyfus to Baker would have
been caught by that equitable assignment. However, as I endeavoured to explain
early on in this Declaration, these conclusions seem to me to be moot on the
facts of this case. Regardless of the assignment, Louis Dreyfus effected a
payment by EFT to Adora, not Baker, beneficially and so Adora has no need to
rely upon the equitable assignment in order to establish that the funds in
question are its property.

34. Lastly, I should add that if there is, contrary to my view, some technical
difficulty with regarding clause 1(a) as an immediately effective assignment, an
English court would be highly likely to give clause 1(a) effect as an agreement
to assign if that is possible. It seems to me all but inconceivable that an English
court would decline to give practical effect to clause 1(a) if it is possible to do
so, whether as an immediately effective assignment or as a mere agreement to
assign. To decline to give practical effect to clause 1(a) if it is possible to do so
would, in my opinion, be to construe the clause in a way that would flout

business common sense and to defeat the manifest intentions of Baker and Adora.

**What if clause 1(a) is a a mere agreement to assign?**

35. If my opinion on the effect of clause 1(a) is wrong and it operates as a mere agreement to assign, then as Mr Jones has noted consideration would be required for equity to give effect to that agreement as an equitable assignment that arises automatically once the future chose in action come into being, that is, on Mr Jones's analysis, once the 'actual' freight becomes due. Moreover, as Mr Jones has noted, that the agreement to assign is contained in a deed is not of itself sufficient and separate consideration must be found if the agreement to assign to be given effect in equity.

36. In this regard, Mr Jones considered first (at his paras. 34 and 35) the statement in the deed itself that the assignment was *"made for good and valuable consideration the receipt of which is hereby acknowledged"*. Mr Jones's view here is that while an English court might be unwilling to let Baker itself resile from this representation to Adora, there would be no good reason why such an approach should be taken when Adora is seeking to rely on the equitable doctrine in relation to a third party such as Egyptian: Egyptian has made no such representation as to consideration.

37. There is, insofar as I am aware, no clear authority on this point. However, it strikes me as unsatisfactory that an assignment could be binding as between assignor and assignee and yet ineffective as against a third party such as Egyptian. An assignment is, after all, something which affects proprietary, not merely personal, rights. Of interest is the following statement of Smith J (at pp 515-6) in the <u>Walker</u> case to which I have already referred in a different context.

*"No person claiming under the assignment, and no person claiming under the assignor, and, indeed, no person having any interest whatever in the assignment, has ever taken any step to impugn it, and up to the present time it stands valid*

*and unimpeached. <u>I am of opinion that, this being so, it is not competent for a</u>*
*<u>mere stranger to the assignment to successfully raise any point as to whether a</u>*
*<u>Court of Equity would or would not enforce it</u> …"* [emphasis supplied].

38. Also of some relevance is the <u>Holt</u> case itself.  There, Atkinson J stated at 7:
*"[t]he further proposition which has been established is that a judgment*
*creditor stands only in the shoes of his debtor and can take only that which the*
*debtor can honestly deal with at the time the order nisi* [that is, the final
garnishee order] *is served"*.  This suggests to me that, as a matter of English law,
Egyptian would be regarded as 'standing in the shoes' of its debtor, Baker, and
accordingly if the assignment is valid as against Baker by reason of the
representation in the deed regarding valuable consideration, so is it valid against
Egyptian.

39. I think that Mr Jones puts matters much too emphatically insofar as he suggests
that there are not strong arguments that Egyptian is in no better position than
Baker as regards the statement as to consideration in the deed.  But, as I have
already observed when addressing Mr Jones's analysis of <u>Holt</u>, these issues –
going directly to the question of whether an (alleged) creditor of an assignor can
attach property subject to an assignment that is valid as between assignor and
assignee – seem to me in any case to be issues of US law.

40. Lastly as regards on the statement in the deed, it seems to me that it is of itself
some positive evidence that valid consideration was provided.  After all, that it
what is represented by both Baker and Adora in the deed they executed.

41. I turn, finally, to that question: was there consideration for the agreement to
assign (if, contrary to my view, that is what clause 1(a) of the deed was)?  Mr
Jones has raised the question of forbearance to sue in this regard.  I agree with
his summary of the law (paras. 37 and 38) but there is authority which suggests a
particular willingness on the part of the English courts to find forbearance to sue
in the context of upholding agreements to assign.

(1) In the <u>Holt</u> case, Atkinson J (at p 8) drew the following proposition of law from the Court of Appeal's decision in Glegg: *"the law, if it possibly can, will infer forbearance to sue where the assignment has been made to an existing creditor"*.

(2) In <u>Glegg</u>, Vaughan William LJ quoted (at 481) and relied upon the following statement of the law by Lord Macnaghten in <u>Fullerton v. Provincial Bank of Ireland</u> [1903] AC 309 (House of Lords):

> *"My Lords, this point seems to me to be settled by authority. In such a case as this it is not necessary that there should be an arrangement for forbearance for any definite or particular time. It is quite enough if you can infer from the surrounding circumstances that there was an implied request for forbearance for a time, and that forbearance for a reasonable time was in fact extended to the person who asked for it. That proposition seems to me to be established by the case of* Alliance Bank v. Broom*, to which my noble and learned friend Lord Lindley referred yesterday, and other cases, among which I may mention* Oldershaw v. King *, with the observations on that case and on the case of* Alliance Bank v. Broom *by Bowen L.J. in* Miles v. New Zealand Alford Estate Co.*; and I may add that the proposition seems to be good sense."* [footnotes omitted]

42. The most recent relevant decision at the highest level is <u>R v Attorney General for England and Wales</u> [2003] UKPC 22, a decision of the Privy Council on Appeal from New Zealand and so not strictly binding on an English court but nevertheless of considerable persuasive authority as the Judicial Committee contained 5 Law Lords.  Lord Hoffmann delivered the majority judgment and stated at paras. 30 to 32:

> *30.     The classic definition of consideration is that of Sir Frederick Pollock, cited by Lord Dunedin in* Dunlop Pneumatic Tyre Co v Selfridge & Co Ltd *[1915] AC 847, 855:*
> *"An act or forbearance of one party, or the promise thereof, is the price for which the promise of the other is bought, and the promise thus given for value is enforceable."*
>
> *31.     In the present case the price for which R's promise was bought was the forbearance of the MOD to exercise its power to return him to unit.  It could not be a promise that he would not be returned to unit, because, as their Lordships*

*have already observed, the Crown was entitled to move him to another regiment and could not fetter its discretion by a contract having effect in private law. Whether there were any circumstances in which it could have created a legitimate expectation giving rise to rights against the Crown in public law is a matter which their Lordships need not discuss. But the actual forbearance was in their Lordships' opinion sufficient consideration to support the contract. In* Alliance Bank Ltd v Broom *(1864) 2 Dr & Sm 289, 292 the bank demanded security for its loan in circumstances in which, as Sir Richard Kindersley V-C said, it would otherwise have enforced payment. It made no promise not to demand payment but:*
*"the [bank] did in effect give, and the defendant received, the benefit of some degree of forbearance; not, indeed, for any definite time, but, at all events, some extent of forbearance."*

*32.      The authority of this case has never been doubted and their Lordships think that its principle adequately covers the present case. If R had refused outright to sign the contract, he would have been returned to unit. As it was, the MOD forbore from exercising its power to do so; R remained in the SAS, a valued soldier, and when he said that he wanted to leave, the commanding officer asked him to reflect before eventually consenting. This practical benefit to R was a sufficient act of forbearance to make his promise enforceable.*

43. Bearing all of the above in mind, I would make the following observations regarding the points Mr Jones makes at paragraph 39.

   (1) As regards his paragraph 39.a, it seems unsurprising that Adora had not provided evidence of consideration initially. Until Mr Jones undertook his analysis, it does not seem that anyone had thought that Adora would need to show consideration. The assignment – or, for present purposes, I should say agreement to assign; consideration is only relevant if clause 1(a) is, contrary to my view, a mere agreement to assign – is, after all, by deed. Of course, ordinarily, one does not need to show consideration if an agreement is made by deed.

   (2) I agree with Mr Jones's observation in his paragraph 3.b that it is well arguable that the terms of the deed itself tend to suggest that Adora was not making any promise to forbear from suing for the debt owed to it by Baker. In my opinion, the contrary is well arguable too, albeit Mr Jones's conclusion that *"[t]here is nothing to suggest that Adora were*

*giving up the right to sue for the debt at any time"* is probably to be preferred.  However, a *promise* to forebear from suing for the debt is unnecessary, actual forbearance (in other words, forbearance in fact) being sufficient.  As explained below, it is now quite plain from the evidence provided by Mr Gallanis and Mr Lemos that there was actual forbearance in this case and so it seems to me that the issue of whether the deed itself contains an implied promise on Adora's part to forbear from suit is effectively moot.

(3) I am less sure about Mr Jones's second observation in paragraph 3.b, that it is well arguable that the terms of the deed itself do not readily justify the implication of a request by Baker to Adora not to sue for the debt.  Relevant here is the case of *Wigan v English & Scottish Law Life Assurance Society* [1909] 1 Ch 291, which is summarised in *Chitty* at para. 3-059 as follows.  "[A] *debtor executed an assignment by way of mortgage of an insurance policy in favour of his creditor.  Parker J held that the creditor, who knew nothing of the mortgage, had given no consideration for it; but he added that the creditor would have provided consideration if he had been told of the mortgage and if, "on the strength of" it, he had actually forborne to sue for the debt"* [footnotes omitted].  It seems to me that the analogy with this case is obvious – here the creditor, Adora, plainly knew of the deed of assignment (it executed it) and so it seems to me that the only hurdle for Adora to surmount is to show that, on the strength of the deed, it actually forbore from suit.

44. As regards that issue – did Adora actually forbear from suit – especially given the authorities to which I have referred, it seems to me likely that an English court would find that it had, even on the evidence that was before Judge Stein at the original hearing.  The statement in the deed that Adora was *"unwilling to extent the terms of the advance"* does suggest, it seems to me, that Adora would have taken steps to enforce its debt if the assignment had not been provided.  However, it seems to me that the question of actual forbearance has now been

put beyond doubt by the additional evidence of Mr Gallanis and Mr Lemos. Mr Gallanis states that Adora threatened suit but, in light of the deed, did not sue. Ultimately, this is of course a matter of fact for the Court.

45. In summary, therefore, at a minimum if, contrary to my view, clause 1(a) is not effective as an actual and immediate assignment, it is effective as an agreement to assign enforceable as an assignment in equity. Equity requires consideration if it is to enforce an agreement to assign in this way, notwithstanding the agreement was by deed. But actual forbearance to sue is adequate consideration and it seems clear on the facts that Adora forbore from suit because Baker granted the assignment.

## **Conclusion**

46. I trust it will be clear that, in my opinion, whether or not there was a valid assignment seems irrelevant (as the funds were on their way to Adora beneficially, not to Baker, and so Adora has no need to rely on the assignment) but that if I am wrong in that, I am of the view that English law would find that the funds in question are subject to a valid assignment (or, alternatively, an enforceable agreement to assign) to Adora.

47. I note that Mr Jones has concluded that the arguments available to Egyptian give rise to a substantial possibility of it succeeding on the appeal. I disagree. For the reasons I have given, I believe that any appeal would in all likelihood fail.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 22 May 2008.

EMMET PAUL COLDRICK