UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

EGYPTIAN NAVIGATION CO.

                Plaintiff,

- against -

BAKER INVESTMENTS CORPORATION and
BAKER INTERNATIONAL GROUP

                Defendants.

------------------------------------------------------------X

**ECF CASE**

08 Civ. 02080 (SHS)

**SUPPLEMENTAL DECLARATION OF MARK WINGATE JONES
IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY OF
EXECUTION OF ORDER VACATING MARITIME ATTACHMENT**

MARK WINGATE JONES of Stone Chambers, 4 Field Court, Gray's Inn, London WC1R 5EF, hereby declares pursuant to 28 U.S.C. Section 1746:

**Introduction**

1. I am the same Mark Wingate Jones that has already made a Declaration in these proceedings. That Declaration was mistakenly dated 5 March 2008, but was in fact signed on 5 May 2008.

2. I make this Supplemental Declaration in further support of ENC's motion for a stay of execution of the US Court's Opinion and Order (entered on 14 April 2008) vacating the maritime attachment of certain funds restrained by Citibank.

3. I have been provided with the following additional materials:

    a. Memorandum of Law, dated 22 May 2008 (submitted by Lyons & Flood, attorneys for Adora)

1

    b. A 2nd Affirmation of Antonis Lemos (22 May 2008)

    c. A 2nd Affirmation of Phillipos Gallanis (20 May 2008)

    d. Declaration of Emmet Paul Coldrick (22 May 2008)

4. I have been asked to comment further on the English legal aspects of the case, and in particular on Mr Coldrick's Declaration.

5. As with my first Declaration, I have sought to limit the views expressed below to matters of English legal principle, and to avoid usurping the role of the US Court in applying those English legal principles to the facts of this case. Again, I am also very much aware of the interlocutory nature of the application presently before the US Court, but again, if so instructed, I will gladly expand on the views expressed below for the purposes of the appeal itself.

6. At the outset, I wish to comment on the way in which Messrs Lyons & Flood have characterized some of the conclusions reached by myself and Mr Coldrick.

    a. First, at p.4 of their Memorandum, my conclusions are dismissed as "tenuous". Unsurprisingly, I rather strongly disagree and should make it clear that I remain of the opinion that the arguments available to ENC give rise to a substantial possibility of it succeeding on the appeal.

    b. Second, also at p.4 of their Memorandum, they say "Mr Coldrick further explains ... it is clear that" Clause 1(a) of the Deed was an actual assignment of the contractual right to such freight as falls due under the "Louis Dreyfus" sub-charter, and refer to Coldrick/21. With respect, at Coldrick/21, Mr Coldrick does not say that "it is clear", but rather expresses his view that he would "expect" an English Court to construe the Deed as he suggests.

7. While I appreciate that Lyons & Flood are advocating their client's case, such distortion is not – with respect – helpful. In light of that, I respectfully suggest that the Court

considers the Declarations made by the English lawyers rather than overly rely on the summary provided by Lyons & Flood.

8. I should also add that I stand by the views expressed in my first Declaration save where expressly stated below. The mere fact that I have not addressed in detail each and every point taken by Mr Coldrick in his Declaration should not be taken to mean that I agree with him.

## The apparent irrelevance of the assignment

9. At Coldrick/9-13, Mr Coldrick expresses a view that the assignment is in fact irrelevant in light of the manner in which the funds were transferred to Adora.

10. That he should feel that such commentary falls within his competence as an English lawyer is surprising. Indeed, he appears to be aware that he is straying beyond his remit when he says "I appreciate that the above may touch upon issues governed by US law" (Coldrick/12). The point he raises may well involve issues of US law. More importantly, however, is the fact that the issue raised simply does not involve any matters of English law – the payment involved entities with connections to Switzerland, Marshall Islands, Greece, and the US, but had no connection with England. It is only issues relating to the purported assignment that are governed by English law, and then only because of the Adora's and Baker's contractual agreement that it should do so.

11. Thus neither Mr Coldrick nor I are competent to assist the US Court on that issue, and so I will refrain from commenting further.

## The construction of the Deed of Assignment

12. I agree with the general principles of construction set out at Coldrick/16-19. I would particularly urge the Court to read with care the passages quoted by Mr Coldrick at Coldrick/16-17.

13. At the risk of repetition, it is worth again setting out the key part of the Deed, i.e. Clause 1, which provides (sic):

> "The Assignor hereby assigns to the Assignee with full title guarantee irrevocably and absolutely the following property, rights, claims and liberties:
>
> (a) the sub freights (Earnings) from the sub charter of the vessel Djebel Refae to Louis Dreyfus estimated to be in the sum of USD 120,000;
>
> (b) All other sub freights (Sub Freights) from subsequent fixtures of the vessel Djebel Refae until the Debt has been repaid in full."

14. I have already explained at some length my views as to the construction of the Deed in my original Declaration. Those views have not changed.

15. I agree that an English Court would be unlikely to construe the Deed as being of no effect at all, but I remain of the view expressed at Jones/29: i.e.: "The process of construing the Deed is, at root, one for the US Court applying English law principles. Again, without wishing to usurp the role of the Court, I think it is only fair to say that there is a good chance that an English Court would construe the Deed as an 'agreement to assign' the sub-freights if and when they were earned, rather than hold it to have been of no effect at all."

16. Mr Coldrick expresses the belief that a construction of the Deed which regards

    a. clause 1(a) as an immediate assignment of the contractual right to claim freight (albeit in a sum not yet ascertained and conditional on due performance of the charter) under the Louis Dreyfus sub-charter, and

    b. clause 1(b) as an agreement to assign the sub-freights under future fixtures of the vessel,

    is "both reasonable and likely"

17. I disagree.

18. Again without wishing to usurp the role of the US Court, I think it is more likely that an English Court would construe Clause 1 as having been intended to operate in the same way throughout – i.e. Clause 1(a) and (b) would both be construed in the same way. The operative words "hereby assigns to the Assignee with full title guarantee irrevocably and absolutely" are common to both Clause 1(a) and (b), which suggests that the parties intended the Deed to operate in the same way in respect of Clause 1(a) and Clause 1(b). Indeed, I think to suggest that the parties – looking at it objectively – meant the effect to be different in each case would be a construction that 'flouted business sense' and would involve just the sort of 'technical nicety' that should generally be avoided.

19. In my opinion, the English Court is more likely to look at Clause 1 in the round and to conclude that the parties intended to agree that Adora would get all the freights earned by the vessel (and in particular under her current charter to Luis Dreyfus) if and when any such freights were earned by Baker. Indeed, I very much doubt that the English Court would feel the need to read into Clause 1, and Clause 1(a) in particular, an assignment of the contractual right to claim freight - it is not necessary to do so in order to avoid 'flouting business sense'. On the contrary, I expect that an English Court would find that Adora simply wanted to ensure that Baker was bound to pay over any freights it managed to earn until its debt to Adora had been satisfied, and did not have any intention (looking at things objectively) of getting involved with the enforcement of any contractual right to freight under any of Baker's sub-charters.

20. Thus, as stated above, I remain of the view that there is a good chance that an English Court would construe the Deed as being an agreement to assign the actual freights, if and when they fell due, under the current charter (as identified in Clause 1(a)) and under future charters (clause 1(b)).

**"What if clause 1(a) is an actual assignment?"**

21. At Coldrick/29-34, Mr Coldrick considers some of the difficult case law regarding the distinction between an existing chose in action (which is capable of immediate assignment) and a future chose in action (which is only capable of being the subject of an agreement to assign). I do not think that Mr Coldrick has – or, to be fair, purports to have – conducted a full analysis of all the cases on this topic. Nor have I.

22. I do not propose to get drawn into a full discussion of the English case law, nor indeed the informative Commonwealth case law (i.e. the New Zealander and Australian case law), in light of the interlocutory nature of the current proceedings.

23. Instead, I repeat the overview – and notes of caution - that I gave at Jones/18-21, to which I add the following limited remarks.

24. First, the apparent ease with which Mr Coldrick seeks to dismiss the Commonwealth case law on this topic is, with respect, misleading. It is true that the case law of New Zealand and Australia is not binding on the English Courts. It is, however, treated with great respect by the English courts – especially when the case in question was determined by the appellate Courts (e.g. the High Court of Australia, which is the senior appellate court in Australia).

25. Second, this is *not* a case in which, as at the date of the Deed (22 February 2008), it is *certain* that Baker would have earned freight under the "Louis Dreyfus" sub-charter. Many things could have gone wrong so as to leave Baker without any freight.

26. Third, and in any event, the cases cited in support of the notion that 'a right to a sum yet to fall due under an existing contract can be assigned' are far from uncontroversial. Indeed, it would seem to offend against the logical principle that one cannot transfer title in something that does not yet exist. As I said at Jones/20, there is an apparent and unfortunate failure in some of the older cases to distinguish between an actual transfer by assignment and a specifically enforceable contract to transfer by assignment. Further, the required element of 'certainty' as to the accrual of the future property in question that arises during the discussion is particularly difficult, because in reality it will never be a matter of certainty, but rather a question of likelihood. As soon as one accepts that (as I think one must), then one runs squarely into the problem that you cannot give away that which you do not yet have – all you can do is agree to give it away if and when you get it. In my opinion, a number of the cases can be explained on the basis that they in fact involved the assignment of the contractual right to claim as yet unearned or ascertained monies which would almost certainly be earned and ascertained in the future under an existing contract, rather than on the basis of an actual and immediate (but in my view

practically impossible) assignment of those future as yet unearned or unascertained monies themselves.

27. Fourth, I refer the US Court to another case of the High Court of Australia: <u>Shepherd v FCT</u> [1965] 113 CLR 385,[1] and invite the Court to read the report for the facts of the case. What is most illuminating about that case is that it reveals that the key factor is in reality the proper consideration of the way in which the purported assignment is drafted. In the <u>Shepherd</u> case, the High Court of Australia held that the purported assignment was of presently existing property, not of a mere expectancy, and was valid. The reasoning of the majority (Barwick CJ and Kitto J) can be summarized as follows: There were two things that the assignor might have attempted to dispose of - (1) 90% of such royalty payments that might accrue to him under a patent licence, or (2) 90% of that portion of his contractual rights under the patent licence which entitled him to receive such royalty payments. The first of those was a mere expectancy (even though it arose in relation to an existing contract), the second an existing right. Or, as Kitto J put it in graphic, but helpful, terms: the first was the "fruit", and the second was the "tree"; before he went on expressly to compare the case to the English cases of <u>Brice v Bannister</u> and <u>Hughes v Pump House Hotel Ltd</u> (see [1965] 113 CLR 385 at p. 396). As Kitto J pointed out: "The tree, though not the fruit, existed at the date of the assignment as a proprietary right of the appellant of which he was competent to dispose." The majority construed the purported assignment as being of the 'tree' and so valid, whereas Owen J dissented concluding that it was of the 'fruit' and so invalid.

28. The <u>Shepherd</u> case (cited by <u>Chitty</u> at 19-028, fn 112) is, in my opinion, a useful tool in identifying how an English court would approach the problem – i.e. as one of construction of the Deed: does it purport to assign the 'fruit' (in which case it could only take effect as an agreement to assign supported by valuable consideration), or does it purport to assign the 'tree' (in which case it could take immediate effect)? As I have already stated, I am of the view that the court would be more likely to construe Clause 1 – including both 1(a) and 1(b) – as the former, i.e. a purported assignment of the 'fruit' capable of taking effect only as an agreement to assign.

---

[1] In which <u>Norman v FCT</u>, another case of the High Court of Australia, was discussed.

29. This point ties back in with what I said at Jones/19: "It is also important to note that even where there is an existing chose of action which is capable of actual assignment, the proceeds of that chose in action may constitute only an expectancy." As noted at Coldrick/31(4), those words are taken from Chitty 19-030, and are supported by citation of Glegg v Bromley [1912] 3 KB 474 and Williams v Commissioner of Inland Revenue [1965] NZLR 395 (Court of Appeal, New Zealand).

   a. The Williams case is a good example of the 'fruit' / 'tree' distinction discussed above: in that case the purported assignment was construed as being of the 'fruit' (a mere expectancy), and not of the 'tree' (the existing life interest under a trust which could have been assigned), and hence was not enforceable in the absence of consideration. Mr Coldrick appears to dismiss the Williams case on the basis that it is a "New Zealand tax case" (Coldrick/31(4)(a)). As I have already noted above, the Commonwealth case law – especially that of the appellate courts – has considerable influence, even if it is not actually binding on the English Courts as a matter of precedent. As for the suggested distinction based on the case being one concerning tax, that distinction is, with respect, a distinction without a difference. On the contrary, the tax cases (such as not only Williams, but also Norman v FCT and Shepherd v FCT) would seem particularly apposite given that they involve party A seeking to rely on the validity of a purported disposal of property by assignment to party B in the face of the scrutiny of perhaps the most obvious of potentially interested third parties – the taxman.

   b. Glegg v Bromley is, as pointed out by Mr Coldrick (Coldrick/31(4)(b)), a decision of the English Court of Appeal. The distinction between the 'tree' (in that case a cause of action for slander) and the 'fruit' (any sums awarded as a result of that cause of action) is very clear, and is discussed in the judgments in that case. Indeed, I do not see any indication of the 'assumption' referred to in Chitty, and relied on as a distinguishing factor by Mr Coldrick (without any reference to the case report itself). On the contrary, the judges of the Court of Appeal all seem to have construed the document in question as purporting to assign money that might thereafter be acquired by means of the pending action for slander (which required

valuable consideration before equity would enforce it), as opposed to as purporting to assign the cause of action itself (which would have failed because of the rules against assigning a bare cause of action). Far from assumptions, the judgments all contain express discussion of the issue – see esp. Vaughan Williams LJ at 484, Fletcher Moulton LJ at 487-489, and Parker J at 489-490. In a further apparent attempt to distinguish or sideline the case, Mr Coldrick also fixes on Chitty's reference to the case being one "where the purported assignment was of the proceeds of a defamation action, not of a chose in action arising under a contract" (Coldrick/31(4)(b)). Again, that is a distinction without a difference: whether the 'tree' in a particular case is a trust, a cause of action or a contract is neither here nor there. Indeed, in Glegg itself, Fletcher-Moulton LJ said as much at p.489: "I decline to make any difference with regard to this money by reason of the source from which it comes."

30. In light of the above, I stand by the views expressed at Jones/18-21, and would re-state my opinion that an English court could only give effect to the purported assignment of the freights yet to be earned by the vessel by construing Clause 1 (both 1(a) and 1(b)) as an agreement to assign – a construction that I accept there is a good chance would be given to the Deed by an English Court so as to give effect to the parties' intentions.

**The issues regarding consideration**

31. It is common ground that equity requires an 'agreement to assign' to be supported by valuable consideration before it will permit its enforcement on the basis that equity regards as done that which out to be done.

32. At Coldrick/36-40, Mr Coldrick is critical of the views stated by me at Jones/34-35 regarding the assertion in the 'BACKGROUND' section of the Deed that the assignment was made "for good and valuable consideration the receipt of which is acknowledged."

33. He bases his criticism on the following remark of principle: "... it strikes me as unsatisfactory that an assignment could be binding as between assignor and assignee and

yet ineffective as against a third party such as Egyptian. An assignment is, after all, something which affects proprietary, not mere personal, rights." (Coldrick/37).

34. With respect, Mr Coldrick appears to have conflated two different doctrines.

   a. First, there is the doctrine by which equity will enforce an agreement to assign if it is supported by valuable consideration. That doctrine does indeed give, as a general rule, the purported assignee a <u>proprietary</u> interest in the subject matter of the assignment that is good against the world.

   b. Second, there is the doctrine of estoppel by which, in certain situations, a party that has made an inaccurate representation to another can be barred from subsequently denying the truth of that representation <u>by that other party</u>. Such an estoppel is a personal equitable remedy, and does not of itself involve proprietary rights. In this case, for example, Adora would only need to resort to an estoppel argument against Baker if, in fact, no consideration had been given by Adora and so it had <u>not</u> acquired proprietary rights in the subject matter of the purported assignment by virtue of the equitable doctrine described above. Adora would then have to seek to rely on a personal estoppel against Baker so as to preclude Baker arguing as against Adora that – as a matter of fact - no consideration had been given, as such an argument would run counter to the representation made by Baker in the Deed. Of course, as regards a third party such as ENC – or, for example, the taxman, no such personal estoppel exists, and so, as against such a third party, Adora could not overcome the absence of consideration that prevents it from acquiring a proprietary right under the equitable doctrine.

35. With respect, Mr Coldrick appears to have conflated the personal estoppel doctrine with the proprietary equitable doctrine by which a party to an agreement assign can acquire an immediate interest in the subject matter so long as the agreement is supported by valuable consideration. The former only comes into play as against a particular representor if a party cannot meet the requirements of the latter.

36. Mr Coldrick seeks support for his (in my view misconceived) statement of principle from two passages from the case law: the first from the <u>Walker</u> case, and the second from the

Holt case (Coldrick/37-38). Neither case addressed the point in hand (as seems to be accepted by Mr Coldrick when he concedes that he is unaware of any clear authority on the point). Both cases in fact only support the basic notion that a third party cannot have stronger grounds for challenging the purported assignment itself than the assignor (usually the third party's debtor).[2]

37. In my opinion, the argument suggested by Mr Coldrick would permit parties to side-step the equitable requirement that valuable consideration must have been given. Equity does not assist a volunteer - hence the rule that the fact that the purported assignment is in the form of a Deed does not satisfy equity's substantial requirement for valuable consideration (even if it does suffice to render a contract binding at law). Statements akin to that in the 'BACKGROUND' are often added into contracts of all sorts – e.g. statements to the effect that no representations have been relied upon in entering the contract, etc. If such a statement could be relied upon as against the world as – in effect - satisfying the requirement for valuable consideration (on the basis that a third party would also be caught by the estoppels), then a third party would struggle ever to challenge an agreement to assign that contained such a statement. That would, in my opinion, be absurd and would amount to a triumph of form over substance – something that is anathema to equity.

38. I would add, in any event, that a party in Adora's shoes would very probably struggle to get any such estoppel argument off the ground for the simple reason that it would have been well aware of whether it had given valuable consideration, and so would have difficulty in showing that it had reasonably relied on the truth of the statement about

---

[2] While I do not understand Mr Coldrick to be relying on such a suggestion, I would wish to observe that the quotation from the Judgment of Smith J in the Walker case cannot, in my view, have been intended to amount to a general prohibition on third parties such as ENC from challenging the alleged operation of the equitable doctrine by which an agreement to assign for valuable consideration is enforced. Any such blanket prohibition would seem directly contrary to the requirements of fairness that underpin equity, and frankly a rule of breathtaking width. Indeed, the very fact that there are so many cases since the Walker case was decided in 1884 in which third parties, such as the tax authorities, have challenged the alleged operation of the equitable doctrine without being faced with such a blanket prohibition strongly suggests either that Smith J's words should not be construed as creating such a prohibition, or that any such prohibition has long since fallen by the wayside and does not represent the current state of the law. In the event that Adora do seek to argue the existence of such a blanket prohibition, I would be glad to research the point and to assist the US Court further.

consideration having been given made by Baker in the 'BACKGROUND'. Establishing such reliance would be a necessary element of such an estoppel against Baker.

39. Finally, I note Mr Coldrick's remark that the statement in the Deed was "of itself some positive evidence that valid consideration was provided." I have to say that I very much doubt that an English Court would give any, or any significant, evidential weight to the statement. As noted above, such statements are often included in contracts and are akin to 'boiler plate' provisions. The English Court would, in my opinion, look for evidence of actual consideration, and not rely on such self-serving statements made by the parties – it would seek substance over form.

40. Thus, I remain of the view expressed at Jones/34-35, and indeed would now go further and say that I think it very unlikely that an English Court would attach any real significance to the statement regarding consideration in the Deed itself.

41. I turn finally to Coldrick/41-44 and Mr Coldrick's views on whether valuable consideration was in fact given in this case.

42. There is considerable common ground between us when it comes to matters of legal principle – although I stand by the way in which I expressed those principles at Jones/37-38. As I said at Jones/39, whether or not there was valuable consideration is a matter for the US Court to determine on the evidence. However, as I did in my first Declaration, I would respectfully draw attention to certain points that arise in light of Mr Coldrick's Declaration and the 2nd Affirmations of Lemos and Gallanis.

43. As I stated at Jones/39, it is essential that the actual forbearance upon which it appears that Adora relies must have been given at the request of Baker. That request can be express or implied. Actual forbearance which is not induced by either the express or implied request of the debtor – i.e. Baker - does not amount to valuable consideration. Mr Coldrick says that he agrees with the summary of the law at Jones/37-38 (Coldrick/41). Indeed, the passage that he quotes (at Coldrick/41(2)) from the judgement of Lord Macnaghten in <u>Fullerton v Provincial Bank of Ireland</u> [1903] AC 309 (House of Lords) makes it very clear that a request – albeit an implied one – is necessary (citing <u>Alliance Bank v Broom</u> in support). In the passage quoted (at Coldrick/42) from Lord

Hoffmann's judgement in R v AG for England and Wales [2003] UKPC 22 (Privy Council), his lordship cites with approval the Alliance Bank v Broom case that was explained by Lord Macnaghten in the Fullerton case.

44. Mr Coldrick also quotes the summary at paragraph 3-059 of Chitty of Wigan v English & Scottish Law Life Assurance Society [1909] 1 Ch 291, which gives rise to the phrase "on the strength of". There is, however, no magic to that phrase. As is clear from the rest of paragraph 3-059 of Chitty, that case is not cited as authority for any sort of proposition that a request – express or implied - is unnecessary. Indeed, it being a decision of Parker J at first instance, it could not stand as authority for such a proposition in light of the House of Lords authorities cited above, or for that matter the Court of Appeal case of Combe v Combe [1951] 2 KB 215 in which the Wigan case was applied and which is the case usually cited in support of the principle that the consideration given must have been requested (and as in fact cited by Chitty at paragraph 3-059).

45. Thus when, at Coldrick/43(3), Mr Coldrick says that the "only hurdle for Adora to surmount is to show that, on the strength of the deed, it actually forbore from suit", I would – with respect – urge a degree of caution. If that remark is intended to suggest that a request – express or implied – from Baker is unnecessary, then it would be incorrect.

46. This then brings me to the new evidence adduced by Adora: the 2nd Affirmations of Lemos and Gallanis. I repeat that the determination of whether a request was made by Baker is one for the US Court, but I respectfully draw the following points to the Court's attention. It seems fairly clear that this additional evidence was – in part – adduced to address the consideration issue in light of what I said in my first Declaration. What is striking, however, is that neither gentleman addresses whether a request for forbearance was made by Baker. Mr Gallanis (with whom Mr Lemos of Baker simply agrees – 2nd Lemos/2) covers the circumstances leading to the execution of the Deed at 2nd Gallanis/2-3: "The simple fact is that BIC had failed to pay off the entire loan given to BIC by Adora by the due date ... Although requested by BIC, Adora did not extend the payment term of the loan. Adora threatened to take legal action against BIC. In response to the threat to sue, BIC and Adora entered into the Deed of Assignment of the sub-freight under the sub-charter ... In light of the Deed of Assignment, Adora did not sue BIC for the outstanding balance due on the loan." It is remarkable that, while he does cover the logical steps said

to have led to the execution of the Deed, and indeed Adora's actual forbearance allegedly in light of the Deed, he does <u>not</u> mention any request from Baker not to sue. It is also striking that no correspondence between Adora and Baker was exhibited by either gentleman, when one would have expected such correspondence to exist if indeed the two companies were unrelated and operated at arm's length (as is asserted at 1st Lemos/8 and 1st Gallanis/10).

**Conclusion**

47. As I said in my first Declaration, I hope that this Supplemental Declaration serves to highlight further the relevant issues of English law – especially in light of the points raised by Mr Coldrick - in a fashion that will assist the US Court in its determination of the motion for a stay pending the outcome of the appeal.

48. As I trust is clear from the above, I remain of the view that the arguments available to ENC give rise to a substantial possibility of it succeeding on the appeal.

I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

By: ........................................
MARK WINGATE JONES

Executed on 10 June 2008